STATE of Tennessee, Appellee,

v.

Heck VAN TRAN, Defendant–Appellant.

Supreme Court of Tennessee.

Sept. 27, 1993.

Rehearing Denied Nov. 1, 1993.

Charles W. Burson, Atty. Gen. & Reporter, James W. Milam, Asst. Atty. Gen., Nashville, Hugh W. Stanton, Dist. Atty. Gen., Jerry R. Kitchen, Phillip Gerald Harris, Asst. Attys. Gen., Memphis, for appellee.

Arthur E. Quinn, Watson, Arnoult & Quinn, Manuel P. Scarmoutsos, Memphis, for defendant-appellant.

## OPINION

DROWOTA, Justice.

The Defendant, Heck Van Tran, appeals his convictions of felony murder in the deaths of Kai Yin Chuey, Amy Lee and Arthur Lee and the sentences of death imposed in each case by the jury. On appeal he challenges, inter alia, the sufficiency of the evidence used to convict him, the failure of the trial court to suppress certain statements, the use of a relative to act as an interpreter for an eyewitness, the introduction of a video tape and color photographs, the refusal of change of venue and individual voir dire, alleged errors in the judge's jury instructions, and the constitutionality of the death penalty. We have carefully considered all of the issues raised by the Defendant and, for the reasons that follow, we affirm his conviction of felony murder and his sentence of death as to Kai Yin Chuey. We affirm his convictions of felony murder as to Amy Lee and Arthur Lee, but reverse his sentences as to them and remand for resentencing for the reasons set out later in this opinion.

### The Facts

On the afternoon of October 20, 1987, Arthur Lee, Amy Lee, and Kai Yin Chuey were found dead in the Jade East Restaurant in Memphis. The restaurant had not yet opened for business that day, and the victims had apparently been inside making preparations for the evening. Jewelry with a wholesale value of $25,000 had been taken from the restaurant. The State's critical proof included: a statement taken from the Defendant in which he admitted his involvement in the crimes; Defendant's fingerprint on one of the jewelry cases taken during the robbery; and the eyewitness identification of the Defendant by a survivor of the robbery.

The victims were all related and worked in the restaurant, which had been owned and operated by the Lee family for years. The family had emigrated from China. Arthur Lee, 24, managed the restaurant for his father, the owner. Amy Lee, 24, was married to Arthur's brother, Chester Lee. Kai Yin Chuey, 74, was Arthur's maternal grandmother. Ging Sam Lee, 75, Arthur's paternal grandmother, survived the robbery. She had been beaten and knocked unconscious; and two diamond rings, a necklace and a watch were taken from her.

The Defendant, Heck Van Tran, was born on November 8, 1966. His mother was Vietnamese; and his father, an American serviceman, died in Vietnam in 1968. The Defendant started school when he was six years old but stopped when Saigon fell. In 1983 a Catholic relief agency resettled the Defendant and his mother in Memphis. The Defendant briefly attended school before dropping out in 1984.

After his arrest by the Houston, Texas, police, Defendant gave a statement in which he acknowledged his role in the robbery and murders. He stated that he had worked briefly at the Jade East Restaurant a month or two before the crimes and that Mr. Lee had fired him because "he didn't like me" and "said I cooked too many egg rolls." The Defendant implicated Hung Van Chung, Kong Chung Bounnam and Duc Phuoc Doan in the robbery. He stated that the four men entered the back door of the restaurant and he talked to Arthur Lee "for about ten minutes before there was any shooting." The Defendant had a .22 revolver, Bounnam a .44, Chung a .22 and Doan a .25.

The Defendant described what happened after the group pulled out their guns:

Mr. Lee grabbed Nam's [Bounnam's] hand with the gun and elbowed him in the chest. Nam fell back and hit the old lady. The old lady fell on me and when she hit me it caused the gun to go off. I don't

know what I hit that time. Mr. Lee then kicked Hung [Chung]. I heard Hung Chung shoot one or two times and then Mr. Lee tried to grab the gun and Hung Chung shoot him. While Mr. Lee was trying to get Hung [Chung's] gun, I told him not to or I would have to hurt him. He turned and tried to get my gun and I shot him. He fell and was moving around and I shot him in the face somewhere. Then I walk thr[ough] the door where they kept the money and gold. I looked up and saw the old lady roll over. I thought she had something in her hand. I shot her in the back of the head.

While the Defendant was in the office collecting the jewelry, he heard more shots. He stated that he did not know "who was shooting or what" or who had shot "the young girl," Amy Lee. Upon leaving the office, the Defendant saw Bounnam holding Ging Sam Lee. The Defendant told Bounnam not to hurt her. Bounnam hit Mrs. Lee on the back of the head, and all the assailants left.

Outside the restaurant, the Defendant discovered that Bounnam had been shot in the left leg near the groin. Bounnam claimed the Defendant had shot him. The group fled in Bounnam's Camaro to an acquaintance's apartment. From there, the Defendant, Bounnam and Chung drove Chung's car to Washington, D.C. Bounnam's Camaro was left in Memphis. Doan remained in Tennessee.

From Washington, the trio drove to Houston, Texas. Once in Houston, the Defendant went to the Saigon Pool Hall and talked with a Vietnamese man about selling some gold. The man took the gold and returned in about ten minutes with $4,000.00. The Defendant paid the man $200 and divided the rest three ways. Later, Bounnam flew to North Carolina and Chung went to Dallas with a friend.

On April 28, 1988, almost six months after the robbery, the Defendant was arrested in Houston. At this time, he was advised of his *Miranda* rights. When asked if he knew why he was being arrested, he replied, "For a shooting in Memphis." He was taken to the main police facility and later to a municipal court judge who read Defendant the stat-

utory *Miranda* warning required by the Texas Code. His written statement was taken May 2, 1988, after he had been advised of his rights a third time. On his return to Memphis the Defendant was fingerprinted. The print of his left ring finger matched a latent fingerprint found on one of the jewelry cases. A TBI firearms examiner testified that two .22 lead bullets, one recovered from Mrs. Chuey's head, the other from Mr. Lee's brain, could have been fired from the revolver used by the Defendant in the robbery. The two bullets were so mutilated and damaged, however, that the examiner could not positively state that they had been fired from that weapon.

Jerry Lee, Arthur Lee's brother and grandson of Mrs. Chuey and Mrs. Lee, arrived at the restaurant after the robbery and triple murders. He testified that he ran a jewelry business out of the restaurant. On the day of the robbery uninsured jewelry with a wholesale value of about $25,000.00 was stolen from the restaurant office. At trial, Jerry Lee identified certain jewelry cases taken in the robbery, one of which had Defendant's fingerprint on it. He identified the Defendant as a former cook who had worked in the restaurant for a week, approximately one month before the robbery. He stated that Defendant had no occasion to go inside the vault and touch any of the jewelry cases while employed at the restaurant.

Ging Sam Lee was 77 years old at the time of trial and had lived in the United States for thirty years. She was the only surviving eyewitness to the robbery-murders. She testified, through a translator, that three or four oriental men had robbed the restaurant and identified Heck Van Tran as one the robbers. She also identified Hung Van Chung as another of the men involved. She stated that Chung, while not an employee, had helped out at the restaurant. She was beaten and robbed. She heard gunfire but did not see anyone being shot. She was knocked unconscious; and, when she awoke, she saw a body lying in the restaurant.

One of the State's witnesses testified that on October 20, 1987, he was driving his automobile into the parking lot of the Jade East

Restaurant when he saw a blue 1970 Camaro leaving the parking lot. The Camaro was four to five feet away from him, and he identified Bounnam as the driver. He also noticed at least two passengers in the car.

Bounnam's brother testified that at eight o'clock on the morning of the robbery his brother and the Defendant drove him to work in his brother's blue Camaro. He further testified he had not seen his brother since that time.

Another State witness testified that he knew the Defendant, Bounnam, Doan and Chung. He stated that Bounnam owned a blue Camaro and further testified that on the day of the Jade East robbery, he saw jewelry boxes like those taken from the restaurant in the dumpster outside his apartment. Another witness testified he was at a friend's apartment and saw the Defendant trying to get a bullet out of Bounnam's leg. Chung and Doan were also present at the apartment.

During their investigation the police discovered small pieces of jewelry scattered on the floor of the restaurant and in the rear parking lot. They also collected six spent .22 caliber cartridges from the restaurant floor. One of the officers videotaped the entire inside and outside of the Jade East Restaurant. Another officer took photographs showing the location of the three bodies, and the exterior of the restaurant, and the parking lot.

The State's final witness was Dr. O.C. Smith, an expert in the field of forensic pathology. He had performed autopsies on the three victims. He testified that Amy Lee died as a result of a contact gunshot wound to the head. He described a contact wound as one in which the muzzle of the weapon is up against the skin surface at the time it is fired. The bullet entered Amy Lee's right forehead about a half inch below the top of her head and was recovered in the left back of the head after going through the brain. After being qualified as an expert in firearms and firearms identification, Dr. Smith gave his opinion that the recovered projectile was a .22 caliber bullet.

Dr. Smith testified that Kai Yin Chuey had bruises under the right collarbone, over the right chest and breast region, on the left upper arm, at the left elbow, and over the knees, all of which were made while she was alive. She died as a result of being shot twice: once through the jawbone and neck thereby severing her windpipe (this wound was six inches or less from the muzzle of the gun) and once through the back of the head through the brain (this was a contact wound).

Dr. Smith stated that Arthur Lee died as a result of multiple gunshot wounds. There were eight wound tracks on his body: to the back of the right hand, to the right chest, to the right side of the jaw, a grazing wound to the left side of the neck, a wound to the back left shoulder at the neck, a near wound to the right back, a wound to the back of the upper right arm and a contact gunshot wound to the right temple. He identified one of the recovered projectiles as being a .22 caliber bullet. He also testified that there was no way to determine the sequence in which these wounds had been inflicted.

The Defendant was indicted for felony (robbery) murder and premeditated murders of Kai Yin Chuey, Amy Lee and Arthur Lee and also for robbery with a deadly weapon of Ging Sam Lee. Based upon the above-described evidence, the jury found Heck Van Tran guilty on three counts of felony murder and fixed his punishment at death for each offense.[1] The same two aggravating circumstances were found in all three cases: (1) the murder was especially cruel in that it involved depravity of mind; and (2) the Defendant committed "mass murder." T.C.A. § 39–2–203(i)(5) and (12) (1982).[2]

1. Judgment was entered upon the jury verdict on June 22, 1989. This case is therefore governed by the statutes in effect prior to November 1, 1989, the effective date of the Criminal Sentencing Reform Act of 1989.

2. The State relied on aggravating circumstances (i)(3) [the Defendant knowingly created a great risk of death to two or more persons other than the victim during his act of murder], (i)(6) [the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another], and (i)(7) [the murder was committed while the Defendant was engaged in committing robbery]. The trial court struck circumstance (i)(6) as inap-

The Defendant was also convicted of robbery by use of a deadly weapon. The trial court sentenced the Defendant to 30 years imprisonment as a standard offender, Range I, to be served concurrently with the above sentences.

### I. *Sufficiency of the Convicting Evidence*

The Defendant initially argues that, while the evidence admitted at trial may be sufficient to support the guilty verdicts when tested against the standard enunciated in Rule 13(e), T.R.A.P., and *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), if the Court holds certain evidence inadmissible, such as the Defendant's confession or the eyewitness's identification of the Defendant by Ging Sam Lee, the proof may no longer be sufficient. We shall treat these evidentiary questions in Sections II and VI.

The Defendant also contends that the evidence is insufficient to support the sentence of death because it does not support the two aggravating circumstances found by the jury. We shall address these issues in Sections XI, XII, and XV.

### II. *Motion to Suppress Confession*

■ The Defendant avers that the trial court erred in denying his motion to suppress his written and oral statements given to the authorities in Texas. The Defendant filed a pretrial motion to suppress his confession given to the Houston police on May 2, 1988, four days after his arrest. In his motion, Defendant asserts that, because he was born in Vietnam, his knowledge, understanding and comprehension of the English language is limited, and his understanding of legal terms is so poor that he was unable to make a knowing and intelligent waiver of his constitutional rights to remain silent and to have the assistance of counsel.

At the evidentiary hearing on the motion the State presented six witnesses while the defense offered four. The Defendant's mother, Mia Tran, testified that Defendant was presently 21 years of age. She explained

that the Defendant, had been ill as a child and that he had not spoken until he was six. The Defendant had not studied English in Vietnam, where he had attended school until the third grade. After his arrival from Vietnam in 1983, he attended American high school for only one year. There he made mostly D's. Tests indicated that his comprehension level was below the fourth grade.

The Defendant testified through a court-appointed interpreter that he learned no English in Vietnam, that he was the sole child of Mia Tran and an American soldier killed by the Viet Cong, and that he never knew his father. He further testified that when he was arrested in April 1988, it was the first time he had been arrested for any offense; that when Sergeant Yarbrough began to interview him, he requested an attorney twice; and that although he understands and speaks some English, he does not speak it very well. During cross-examination, Heck Van Tran stated that when he went before a judge in Texas, he was not sure what the judge was saying but that he nodded at everything the judge said.

The trial court made detailed and extensive findings of fact and conclusions of law in denying the Defendant's motion to suppress the confession. We cite portions of the court's findings of fact.

> The Defendant was arrested on April 28, 1988, at approximately 5:00 p.m. by officers John Chen, B.A. Piel, Sergeant Poale, and Special Agent Barbara Babcock, FBI. The officers had a photo of the Defendant. The Defendant gave a false name upon inquiry. Officer John Chen spoke to the Defendant in English after the Defendant had been advised by Sergeant B.A. Piel of the *Miranda* rights. According to Sergeant Piel, he would read each right to the Defendant and upon the Defendant answering yes, he would proceed on to the next right. Sergeant Piel was of the opinion that the Defendant was responsive to his questions and responded as if he understood. The Defendant responded in

plicable to the facts. The jury did not list (i)(3) and (i)(7) on its verdict form. As to aggravating circumstance (i)(5) [heinous, atrocious or cruel],

the trial court charged the jury only that the murder was especially cruel in that it involved depravity of mind.

English that he was aware of why he was arrested—"For the shooting in Memphis." The Defendant told Officer Chen that one companion was in Dallas, Texas, and not in Houston. Officer Chen asked the Defendant if he understood English and Defendant said, "Yes, I do." Officer Chen was of the opinion that the Defendant understood and spoke English well. At the reading of his rights the Defendant did not request an explanation of his rights.

The Defendant can speak and communicate in the English language in most everyday situations. The Defendant's ability to read is limited and he does have difficulty in understanding the meaning of certain words in the warnings of rights.

The Defendant was taken to police headquarters and later that evening the Defendant was taken before a Judge Dodier pursuant to Texas procedure for advice of his rights under Texas law. Judge Dodier inquired if the Defendant spoke and understood English, to which the Defendant answered yes. There was no request by the Defendant for an interpreter.

On May 2, 1988, at approximately 11:40 a.m., Sergeant J. Yarbrough interviewed the Defendant. He was of the opinion that the Defendant could speak English well enough for him to understand and had no problem communicating. Sergeant Yarbrough advised the Defendant of the *Miranda* rights. The Defendant orally explained his involvement in the Jade East robbery and drew a map of the restaurant. The Defendant had talked to his mother by phone and she advised him to tell the truth. The Defendant agreed to give a written statement which Sergeant Yarbrough typed. After going over the written statement with the Defendant, Sergeant Yarbrough and Sergeant Ken Williamson and Dennis Gafford talked to the Defendant.

The Defendant told Sergeant Williamson that he could not read English but he could speak and understand English. Sergeant Williamson read the written statement so the Defendant would be sure that the statement given to Sergeant Yarbrough was what he said. Sergeant Gaf-

ford asked the Defendant about the warnings at the top of the page and the Defendant responded: "Yes, don't have to talk if don't want to." Sergeant Gafford explained to the Defendant each right individually and had the Defendant initial each one.

In its conclusions of law, the court began by stating:

In analyzing the admissibility of the written statement in this cause the State has a heavy burden to show that a waiver of the *Miranda* rights was freely, voluntarily and knowingly exercised. Courts should indulge every reasonable presumption against waiver of fundamental constitutional rights, *Lee v. State,* 560 S.W.2d 82 (Tenn.Crim.App.1977). In order for the State to overcome the presumption, the State need only prove by a preponderance of the evidence that the constitutional standards were met. *McPherson v. State,* 562 S.W.2d 210 (Tenn.Crim.App.1977); *Lego v. Twoney,* 404 U.S. 477, 92 S.Ct. 619 (30 L.Ed.2d 618), (1972); and *State v. Stearnes,* 620 S.W.2d 92 (Tenn.Crim.App. 1981).

In denying the motion to suppress and holding that the Defendant had knowingly and intelligently waived his *Miranda* rights, the trial court found three aspects of the proof particularly telling: (1) the Defendant's response to Sergeant Gafford that he did not have to talk if he did not want to; (2) his reply that he was speaking with Sergeant Yarbrough because his mother told him to tell the truth; and (3) the logical narrative of the events of the offense contained in the written statement itself. The court also noted that, during the Defendant's cross-examination, he understood some of the questions asked and was ready to answer in English before the questions had been translated. The court concluded that the Defendant had sufficient knowledge of English to understandably, knowingly and intelligently waive his rights.

■ To be valid, a waiver of *Miranda* rights must be voluntarily, knowingly, and intelligently made. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Once it is determined, under the

totality of the circumstances surrounding a waiver, that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer and that he was aware of the State's intention to use his statements to secure a conviction, a court may conclude that *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421–422, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986); *see also Fare v. Michael C.*, 442 U.S. 707, 725–726, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). Language difficulties encountered by a defendant are considered in determining if there has been a valid waiver. *See, e.g., United States v. Hernandez*, 913 F.2d 1506, 1509–1510 (10th Cir.1990); *United States v. Boon San Chong*, 829 F.2d 1572, 1574–1575 (11th Cir.1987); *Perri v. Director, Department of Corrections, State of Illinois*, 817 F.2d 448, 452–453 (7th Cir.1987); *United States v. Bernard S.*, 795 F.2d 749, 751–753 (9th Cir.1986); *United States v. Short*, 790 F.2d 464, 469 (6th Cir.1986). Findings of fact made by a trial court on issues surrounding the giving of a custodial statement are binding upon appellate review if there is any evidence to support them. *State v. O'Guinn*, 709 S.W.2d 561, 566 (Tenn.1986); *State v. Chandler*, 547 S.W.2d 918, 923 (Tenn.1977).

Having studied the transcript of the suppression hearing, we are of the opinion that the evidence presented at the hearing supports the conclusion of the trial judge that the Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. Defendant argues that the fact that the court found it necessary to afford him an interpreter contradicts the holding of the trial court. The provision of a translator, however, is not inconsistent with such a finding, *see United State v. Abou–Saada*, 785 F.2d 1, 10 (1st Cir.1986); and the record shows that the Defendant understood English sufficiently to waive his rights. Likewise, the fact that the Defendant may not have understood all the consequences of his waiver and was unfamiliar with the American legal system is insufficient to invalidate the waiver so long as the proof shows, as it did here, the requisite level of comprehension (i.e., that he need not talk, that he could have a lawyer, and that any statements can be used against him). *Colo-*

*rado v. Spring*, 479 U.S. 564, 573–576, 107 S.Ct. 851, 857–858, 93 L.Ed.2d 954 (1987); *United States v. Yunis*, 859 F.2d 953, 964–966 (D.C.Cir.1988).

## III. *Change of Venue and Individual Voir Dire*

■ The Defendant's next two issues are related in that they stem from the allegation that the present case received extensive and prejudicial pretrial publicity. The case had been featured on the television program *America's Most Wanted*, which aired locally in Shelby County. The Defendant filed pretrial motions for change of venue and for individual voir dire. A hearing was held on the motion for change of venue at which time a market researcher testified concerning a poll he had conducted of 428 Shelby County residents in April 1989. Almost 90 percent of those surveyed had heard something about the case, with 29.5 percent having seen the *America's Most Wanted* episode featuring the crime. Those surveyed who had heard of the crime were twice as likely to feel that an employee had committed the crime. The trial court denied the motion for change of venue with the proviso that, if difficulties arose in finding an untainted jury, it would reconsider its decision.

The court took the motion for individual voir dire under advisement. After the jury selection process began, the Defendant renewed his motion for individual voir dire. The court continued to take it under advisement until it saw how the prospective jurors responded to questions. Forty-eight prospective jurors were voir dired. Approximately half had heard something about the incident; a few were familiar with the restaurant. Almost all were able to set aside what little they had heard and stated they had formed no opinion as to Defendant's guilt based on what they had seen or read. The most notable exception was Peggy Ingram, the only prospective juror who said she had seen the episode of *America's Most Wanted* featuring the crime. She was excused for cause.

Whenever the Defendant asked a prospective juror what he or she had heard, the

prospective juror was called to the bench where defense counsel questioned the juror more thoroughly out of the hearing of the panel. The record does not reveal that individual voir dire was required in this case or that the trial court abused its discretion. *See State v. Simon*, 635 S.W.2d 498, 506 (Tenn. 1982).

With reference to the motion for change of venue, there was no showing that the majority of prospective jurors had been extensively exposed to prejudicial pretrial publicity. In fact, the record itself contains little evidence of pretrial publicity. The Defendant has not carried his burden of showing the clear abuse of discretion required to reverse the trial court's actions. *See e.g., State v. Bates*, 804 S.W.2d 868, 877 (Tenn.1991); *State v. Simon*, 635 S.W.2d at 505; *State v. Hoover*, 594 S.W.2d 743 (Tenn.Crim.App.1979).

### IV. *Right to Jury Trial*

■ The Defendant next avers that the Tennessee statutes concerning exemptions from jury duty and the policies of the Shelby County Jury Commission denied him his right to a jury trial. The Defendant raised these issues in a pretrial motion. After an evidentiary hearing, the motion was denied by the trial court.

The Defendant first contends that the method used by the Shelby County jury commissioner to choose prospective jurors deprived him of his right to a jury composed of a fair cross section of the community because it excluded college students and was more likely to procure as prospective jurors persons who owned assets like telephones, cars and houses. The jury commissioner testified he used five sources for jurors: property tax rolls, voter registration rolls, motor vehicle rolls, the telephone directory and the city directory. Names were chosen randomly from these sources. The names were then "processed" to assure that the persons chosen were eligible to serve as jurors.

The Defendant's second argument is that the statutory exemptions in T.C.A. § 22–1–103, § 63–5–123, § 63–8–117, and § 63–3–118 infringe on his right to a jury composed of a fair cross section of the community. He points out that the exemptions granted cer-

tain professionals, if exercised, could remove large numbers of college-educated individuals from juries in Shelby County.

■ A defendant has a constitutional right to a jury drawn from a venire representing "a fair cross-section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The proof presented by the Defendant fails to establish a prima facie violation of the Sixth Amendment on the ground that the jury fails to reflect a fair cross-section of the community. *See Duren v. Missouri*, 439 U.S. 357, 363–364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989); *State v. Bell*, 745 S.W.2d 858, 860–861 (Tenn.1988); *State v. Blunt*, 708 S.W.2d 415, 417–418 (Tenn.Crim.App.1985); *State v. Nelson*, 603 S.W.2d 158, 161 (Tenn.Crim.App. 1980).

### V. *Opening Statement*

■ The Defendant next contends that the trial court erred in denying his counsel's request to reserve opening statement until the beginning of the defense proof. After the prosecutor had given the State's opening statement at the guilt phase, the Defendant asked to reserve his opening statement until the close of the State's proof. The trial court refused on the ground that Tennessee law requires opening statements be made prior to the introduction of any evidence. The Defendant then waived his opening statement.

The Defendant avers that such action by the trial court not only violates his right against self-incrimination, but also requires him to actively defend himself before the State has carried its burden of proof. T.C.A. § 20–9–301 grants the parties "the right prior to the presentation of any evidence in the case to make an opening statement to the court and jury setting forth their respective contentions, views of the facts and theories of the lawsuit." In *State v. Strange*, 772 S.W.2d 440, 441 (Tenn.Crim.App.1989), the Court of Criminal Appeals held that this statute requires opening statements to be made prior to the presentation of any evidence. We agree.

Opening statements are not evidence. *See Harris v. Baptist Memorial Hospital,* 574 S.W.2d 730, 732 (Tenn.1978). They are statements by counsel setting forth the contentions, views of the facts and theories of the lawsuit that will be presented by each party. The trial court did not err in holding that under the statute a defendant has no right to reserve his opening statement until the close of the State's evidence.

### VI. *Appointment of an Interpreter*

█ The Defendant objected at trial to the State using Jerry Lee as an interpreter for his paternal grandmother, Ging Sam Lee. Defendant avers that the trial court erred in allowing Lee, who was related to the victims Arthur Lee (brother), Amy Lee (sister-in-law) and Kai Yin Chuey (grandmother), to act as interpreter during the testimony of Ging Sam Lee, the only survivor of the robbery. Counsel for Defendant contended that allowing Jerry Lee to act as interpreter would be highly prejudicial to his client.

The State argued that counsel for Defendant had been advised prior to trial that the State was forced to use Lee because another translator could not be found. Ging Sam Lee does not speak English and understands very little of the language. She speaks a rural dialect of Chinese called "Hoi San" (phonetically). The trial judge conducted a jury-out hearing on the issue during which Jerry Lee testified that the few people in this state who speak this rare dialect do not speak English well.

On cross-examination by Defendant's counsel, Lee was asked, "Can you clearly, faithfully, and appropriately translate from your grandmother?" Jerry Lee responded: "I understand that this will be recorded, and I will not add anything to it." When asked again if he could be fair and impartial in the translation, he responded: "I would not say anything more than what my grandmother will say."

The State argued at trial that the Defendant had had ample opportunity "to find somebody to come in and dispute the translation." On appeal the State argues that there was little opportunity for mistranslation since, less than three months earlier, Jerry Lee had translated Ging Sam Lee's testimony in a related case before the same trial judge. The State points out that the testimony of Ging Sam Lee was limited, establishing only her presence at the scene of the murders, her eyewitness identification of the Defendant and one co-defendant, and the items of jewelry stolen from her person. These were the same matters which Ging Sam Lee had testified about in the trial of Hien Huynh, a former employee of the Jade East Restaurant who had been charged as an accessory before the fact to the murders. In that trial Huynh was found not guilty.

The trial court, in allowing Jerry Lee to serve as a Chinese language interpreter for his grandmother, noted for the record that Lee had performed his duties "in a neutral, detached way" in the prior trial of Hien Huynh. Before translating, Lee swore that he would translate from Chinese to English to the best of his ability and skill. He then gave the oath to Mrs. Lee.

█ This is an issue of first impression in Tennessee. Appointment of an interpreter of a witness's testimony in a criminal case is a matter for the trial court's discretion subject to reversal only for abuse of that discretion.[3] We realize that it sometimes

---

3. The growing trend among jurisdictions has been to allow trial courts wide discretion in appointing interpreters. *See United States v. Addonizio,* 451 F.2d 49, 68 (3rd Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972) (Use of witness's wife as interpreter found to be sound exercise of trial court's discretion in selecting an interpreter in accordance with Fed.R.Civ.P. 28(b)); *Kitchens v. State,* 198 Ga.App. 284, 401 S.E.2d 552, 553 (1991) (It was within trial court's discretion to appoint an interpreter where the witness only understood *some* English); *State v. Van Pham,* 234 Kan. 649, 675 P.2d 848, 858–861 (1984) (A court may appoint a competent interpreter of its own selection); *Kley v. Abell,* 483 S.W.2d 625, 628 (Mo.Ct.App.1972) (Appointments of interpreters "generally rest within the discretion of the trial court ..."); *Minor v. State,* 659 S.W.2d 161, 164 (Tex.Ct.App. 1983) ("[T]he appointment of an interpreter is a matter left to the trial court ..."); *State v. Thien Duc Le,* 743 S.W.2d 199, 202 (Tenn.Crim.App. 1987) (Appointment of interpreter held to be discretionary matter for trial court; trial court's failure to appoint interpreter did not deprive defendant of constitutional rights). *See also Peoples National Bank of Greenville v. Manos Broth-*

may be necessary, as in this case, to appoint an interested interpreter where no competent disinterested interpreter is available. However, the better practice is to avoid appointing a friend or relative of a party or witness as an interpreter. The court should attempt to appoint a neutral, unbiased interpreter, one who has no interest in the outcome of the trial. *Almon v. State*, 21 Ala. App. 466, 109 So. 371, 372 (1926) (Disinterested interpreter should be used when possible); *Western & A.R. Co. v. Deitch*, 136 Ga. 46, 70 S.E. 798 (1911) (Where possible, a disinterested interpreter should be used); *Kley v. Abell, supra* at 628 ("[The] most competent and least biased person should be appointed [as interpreter]"); *State In Interest of R.R., supra* 398 A.2d at 86 (Interpreters should be disinterested because interested parties may distort translations). In this case the trial judge was satisfied that no disinterested person was available who could adequately translate the witness' testimony, and he was also convinced that Lee would give an accurate and unbiased translation.

Because the Defendant has not demonstrated that the translation was inaccurate, there has been no showing that Jerry Lee's service as an interpreter caused any prejudice to the Defendant's case. Ms. Lee's testimony and Jerry Lee's translation were recorded. This audio recording of the trial proceedings was and is available to both parties. The audio recording could have been verified by an interpreter who may not have been available at trial. *See Kay v. State*, 260 Ark. 681, 543 S.W.2d 479 (1976). However, this has not been done and we are left to speculate as to the accuracy of the translation. A party contending prejudice must show prejudice.

The voir dire examination of Jerry Lee established his expertise in understanding the Chinese dialect spoken by his grandmother. His own expertise with the English language had been demonstrated during his earlier testimony. He also took an oath to render a true translation to the best of his skill and ability. Nothing in the record suggests that Jerry Lee failed to abide by his oath. Although Tenn.R.Evid. 604 was not in effect at the time of this trial (effective January 1, 1990), the requirements of the rule were met and support the trial court's ruling on this issue.

## VII. Admission of Revolver

■ The Defendant avers the trial court erred in allowing a .22 caliber revolver into evidence at trial. The weapon had been seized at the residence of Hien Huynh during the search of his apartment. The Defendant objected to the admission of the revolver on the ground that the proper predicate had not been laid. The Defendant argues that "the weapon was in no way linked to the Defendant nor to any of the co-defendants." The proof, however, clearly shows that the Defendant stated he had shot two of the victims with a .22 caliber revolver, which belonged to Huynh and which he returned to Huynh. Spent .22 caliber casings were found at the restaurant, and a TBI firearms examiner testified that two of the bullet fragments found inside the bodies of Arthur Lee and Kai Yin

ers, 226 S.C. 257, 84 S.E.2d 857, 868 (1954) ("The qualifications of an interpreter depend much on the circumstances, and should be left for the determination of the trial court").

This discretion will not be reversed unless evidence of abuse exists. *See Lujan v. United States*, 209 F.2d 190, 192 (10th Cir.1953) (Trial court held to have much discretion in selecting interpreter, and its decision would not be disturbed unless evidence of prejudice could be inferred); *People v. Allen*, 22 Ill.App.3d 800, 317 N.E.2d 633, 635 (1974) (Trial court abused its discretion to determine fitness of person used as interpreter); *State v. Burns*, 78 N.W. 681 (Iowa 1899) ("In such matters, the trial court has a discretion that is not to be interfered with, unless there is an abuse of it"); *Minor v. State, supra* at 164 ("[A]bsent a showing of abuse of [trial court's]

discretion, such judgment will not be disturbed upon appeal"); *Brown v. State*, 59 S.W. 1118 (Tex.Crim.App.1900) (Trial court's discretion would not be revised where no abuse of discretion to prejudice of appellant could be shown).

This discretion often extends to the appointment of interested interpreters as well. *See Fairbanks v. Cowan*, 551 F.2d 97, 99 (6th Cir.1977) ("The trial court in its broad discretion can select a close relative of a witness to serve as an interpreter at the trial"); *State v. Bell*, 57 Wash.App. 447, 788 P.2d 1109, 1114 (1990) (Trial court held to have discretion as to whether interpreter is too interested to serve; decision only disturbed if evidence of abuse exists). *Cf. State In Interest of R.R.*, 79 N.J. 97, 398 A.2d 76, 86 (1979) (When trial court is satisfied that interested party is only choice as interpreter, such may be used).

Chuey could have been fired from this revolver. Lee and Chuey were the two victims whom Defendant admitted shooting. We find no error in the trial court's admitting the revolver into evidence.

## VIII. Admission of Video Tape

■ The Defendant also contends that the trial court erred in admitting a videotape of the crime scene made by Officer Garner of the homicide division, Memphis Police Department. The video recording, taken during the early stages of the investigation before the scene was disturbed, depicts the interior and exterior of the Jade East Restaurant and shows the victims as they were found. At trial the videotape was introduced through Officer Garner and played with sound for the jury, over the Defendant's objections that the tape included inadmissible narration and was inflammatory. While the trial court agreed with the Defendant that the narration by Officer Garner included inadmissible conclusions, because the narration also told the viewer what was being seen, rather than turning the volume off, the trial court instructed the jurors that the narrator's conclusions had no weight or value and were to be disregarded. After the tape was played, Officer Garner was cross-examined by the Defendant.

■ The admissibility of authentic, relevant videotapes of the crime scene or victim is within the sound discretion of the trial judge, and his ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion. *State v. Teague,* 645 S.W.2d 392, 397 (Tenn.1983); *see also, State v. Bates,* 804 S.W.2d 868, 878–879 (Tenn.1991); *State v. Payne,* 791 S.W.2d 10, 19–20 (Tenn.1990); *State v. Thompson,* 768 S.W.2d 239, 248 (Tenn.1989) (death penalty cases in which videotapes of the crime scene and victim were used). *See generally* Annot. 41 A.L.R.4th 877, § 11 (1985); Annot. 60 A.L.R.3d 333 (1974).

■ In this case the trial court did not abuse its discretion in admitting the visual portion of the videotape. The tape is neither gruesome nor inflammatory and is highly probative as to the condition and appearance of the crime scene. The trial court, however, should not have allowed the jury to hear Officer Garner's narration. Officer Garner made numerous conclusory statements. A sampling includes: "[the dining room area] doesn't appear to be disturbed or that anyone has been in this area"; "ring laying on floor appears to have been dropped there during the robbery"; "two black boxes possibly contained large amounts of jewelry, this room ... appears to be where the victims might have been prior to being killed"; "rear door apparently where employees came in during daylight hours." The better practice would have been for the trial court to have turned off the volume and had Officer Garner narrate the tape from the witness stand. We are of the opinion, however, that allowing the jury to hear the narration was harmless error because the objectionable narration pertained mainly to minor matters or facts established by proper evidence elsewhere in the record and because of the clear evidence of the Defendant's guilt as established by the other evidence.

## IX. Admission of Photographs of Victim

■ The Defendant avers that the trial court erred in admitting into evidence color photographs of the deceased victims taken at the scene of the incident. The Defendant points out that immediately prior to admitting these photographs, the court had admitted an extensive color videotape showing the victim's bodies as they were found. The Defendant argues that the photographs were cumulative, gruesome and unfairly prejudicial, and contends that their probative value was outweighed by their prejudicial effect. We do not find the photographs excessively gruesome or unnecessarily cumulative. The trial court did not abuse its discretion in admitting the photographs. *See State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

## X. Jury Instructions During Penalty Phase

■ The Defendant avers that the trial court erred in instructing the jury during the penalty phase because the instructions varied from the language of T.C.A. § 39–2–203. At the time of trial Section 203 provided that a

death sentence could be given if the aggravating circumstances proved beyond a reasonable doubt were not outweighed by any mitigating circumstances. T.C.A. § 39-2-203(g) (1982) [now § 39-13-204(g) (1991)]. Alternatively, life was the appropriate sentence where aggravating circumstances were outweighed by one or more mitigating circumstances. T.C.A. § 39-2-203(f) [now § 39-13-204(f) (1991)].

The Defendant contends that the court erred in not charging the language of the statute. The charge given by the court was consistent with the recommended charge contained in the Tennessee Pattern Jury Instructions (Criminal). The Pattern Jury Instructions provide that aggravating circumstances must outweigh any mitigating circumstances before a sentence of death can be imposed. T.P.I. (Crim.) 20.03.[4]

Instructions following the pattern instruction have been previously approved by this Court despite the patterns' variance from the statutory language. *See, e.g., State v. Boyd,* 797 S.W.2d 589, 597 (Tenn.1990); *State v. Porterfield,* 746 S.W.2d 441, 451 (Tenn.1988); *see also State v. Irick,* 762 S.W.2d 121, 133 (Tenn.1988) *cert. denied,* 489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825 (1989) (encouraging trial courts to use the pattern instructions). We find no error in this case.

The Defendant also avers that the trial court erred in failing to instruct the jury that aggravating circumstances must outweigh mitigating circumstances "beyond a reasonable doubt" or must "substantially" outweigh mitigating circumstances. The Defendant seems to be arguing that the court's instruction left the jury without any guidance as to the standard by which aggravating circumstances must outweigh mitigating circumstances. This challenge has been previously rejected. *See, e.g., Boyd,* 797 S.W.2d at 595; *State v. Payne,* 791 S.W.2d 10, 21 (Tenn. 1990); *State v. Thompson,* 768 S.W.2d 239, 251-252 (Tenn.1989).[5]

## XI. *Mass Murder*

■ The Defendant next avers that the trial court erred by instructing the jury on the mass murder aggravating circumstance found in T.C.A. § 39-2-203(i)(12) (1982) [§ 39-13-204(i)(12) (1991)]. That statutory provision reads as follows:

Defendant committed "mass murder" which is defined as the murder of three or more persons within the State of Tennessee within a period of forty-eight months, and perpetrated in a similar fashion in a common scheme or plan.

In *State v. Bobo,* 727 S.W.2d 945 (Tenn. 1987), a majority of this Court upheld the constitutionality of the mass murder aggravating circumstance. The Defendant urges this Court to adopt the dissent in *Bobo.* This we recently refused to do in *State v. Black,* 815 S.W.2d 166 (Tenn.1991), in which a majority of this Court held the mass murder circumstance applicable to a similar set of facts. In *Black,* the defendant murdered three persons within a period of minutes. In the present case the killings were committed by the Defendant and his accomplices within minutes, while engaged in the commission of a robbery. In the guilt phase, the Defendant was found guilty of the murders of Arthur Lee, Amy Lee and Kai Yin Chuey. We find the trial court was not in error when it charged the mass murder aggravating circumstance at the sentencing phase.

## XII. *Cruel—Depravity of Mind*

The Defendant avers that the trial judge erred in charging the jury that the murders were especially cruel in that they involved depravity of mind. Aggravating circumstance T.C.A. § 39-2-203(i)(5) (1982) [§ 39-13-204(i)(5) (1991)] provides: "The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." The trial court and the prosecutor concluded that the murders did not involve torture. *See, e.g., State v. Williams,* 690 S.W.2d 517 (Tenn.1985); *State v. Pritchett,* 621 S.W.2d 127, 139 (Tenn.1981) (instantaneous death by

---

4. The present Code follows the Pattern Instructions in this respect. *See* T.C.A. § 39-13-204(g)(1)(B) (1991).

5. The current statute provides that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt. T.C.A. § 39-13-204(f) and (g)(1)(B) (1991).

gunshot wound not torture). The Court, however, decided to charge a portion of circumstance (5), because it felt that "when one takes a pistol and puts it to somebody's head, there is a question of cruelty and depravity of mind." The Court thereupon charged the jury an edited form of (i)(5): "The murder was especially cruel in that it involved depravity of mind." It then gave the *Williams* definition of "cruel" and "depravity."

■ First, the Defendant contends that the court erred by tailoring the language of circumstance (i)(5) so that it fit the proof of his case. Defendant asserts that it was improper for the court to "dissect" this circumstance by omitting "heinous" and "atrocious" from its instruction. We have previously held that a trial court should charge only those aspects of an aggravating circumstance supported by the evidence in a case. *See State v. Pritchett,* 621 S.W.2d at 140; *cf. State v. Laney,* 654 S.W.2d 383, 388–389 (Tenn.1983) (trial court should charge only those aggravating circumstances the evidence supports). For example, the trial court in this case correctly deleted "torture" from its instruction since none of the evidence supported a finding of "torture" as that term has been defined. *See, e.g., State v. Williams,* 690 S.W.2d at 529; *State v. Pritchett,* 621 S.W.2d at 139.

Less certain is the correctness of the trial court's deletion of "heinous" and "atrocious" from the instruction. As used in circumstance (i)(5), the three adjectives "heinous," "atrocious," and "cruel" are complementary. Although listed disjunctively, they state a unitary concept defined and limited by "torture or depravity of mind." *See State v. Williams,* 690 S.W.2d at 529. The better course would be to instruct all three adjectives to further clarify the nature of that type of murder addressed in circumstance (i)(5). Any error in the omission in this case is harmless, however, because we are convinced beyond a reasonable doubt that the failure to include "heinous" and "atrocious" in the instruction had no effect on the result. *See Clemons v. Mississippi,* 494 U.S. 738, 753–754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990).

The issue critical to a finding of aggravating circumstance (i)(5) in the present case is whether the murder involved "depravity of mind." The charge as given did not, as Justice Daughtrey's dissent concludes, direct the jurors' attention from the state of the Defendant's mind at the time of the killing or mislead the jury regarding what it must find to support a finding of this aggravating circumstance. While the definitions of "heinous" and "atrocious" are superficially more consonant with the concept of depravity, nothing this Court said in *Williams* would limit "cruel" only to those circumstances where torture occurs; and common sense makes no such distinction. A state of mind may be described as "cruel." We find that there is no reasonable likelihood that the jurors in this case were so confused by the instruction that they were misdirected or misled regarding the requirements that must be met before aggravating circumstance (i)(5) could be found. *Cf. Boyde v. California,* 494 U.S. 370, 380–381, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). (In jury deliberations "common sense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting.")

We also do not agree with the dissent that the facts in this record fail to establish "cruelty" as defined in *Williams.* One, like the Defendant, who could brutally execute a helpless, elderly woman can readily be described as a person "disposed to inflict pain or suffering" on another.

■ The Defendant next contends that the trial court erred when it charged the jury aggravating circumstance (i)(5) because the evidence does not support a finding of "depravity of mind." "Depravity" as used in circumstance (i)(5) means "moral corruption; wicked or perverse act"; it is not limited to the infliction of torture; and, as just noted, the critical inquiry is the murderer's state of mind at the time of killing. *State v. Williams,* 690 S.W.2d at 529. In *State v. Black,* 815 S.W.2d 166, 182 (Tenn.1991), a majority of this Court held that the "brutal and senseless execution style murder of a helpless child, who could not protect herself, evinces torture or depravity of mind." In

*State v. Zagorski*, 701 S.W.2d 808, 814 (Tenn. 1985), the Court stated that the infliction of gratuitous violence and the needless mutilation of victims already helpless from fatal wounds indicated a depraved mind. *See also State v. Williams, supra*, 690 S.W.2d at 528, citing *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983) (depravity involves infliction of gratuitous violence on victim, senselessness of crime and helplessness of victim).

 In determining whether the evidence is sufficient to support a finding of depravity, we must consider the three murders separately. Arthur Lee was shot seven to eight times at close range during the course of his struggle with Bounnam, Chung and the Defendant. The cause of death was multiple gun shot wounds. The Defendant confessed to inflicting two of the wounds. During the struggle, when Lee tried to get the Defendant's gun, the Defendant shot Lee, who fell. The Defendant immediately shot Lee again, in the face, as he moved around on the floor. While the proof discloses that Arthur Lee was intentionally and deliberately killed, it is insufficient to establish "depravity of mind" beyond that found in any first-degree murder. *See State v. Pritchett*, 621 S.W.2d 127, 139 (Tenn.1981).

The record shows only that Amy Lee died as the result of a single contact gunshot wound to the head. It is otherwise silent regarding the circumstances of her death or her killer's state of mind. As in the case of Arthur Lee, the evidence is insufficient to establish "depravity of mind" under circumstance (i)(5).

 Inasmuch as we find the evidence insufficient to support one of the two aggravating circumstances found by the jury in the murders of Arthur and Amy Lee, we proceed to a harmless error analysis. *See Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Under the principles set forth in *State v. Terry*, 813 S.W.2d 420, 424–425 (Tenn.1991), we hold that the jury's erroneous consideration of aggravating circumstance (i)(5) was not harmless error. As in *Terry*, once the "especially heinous, atrocious, or cruel" aggravating circumstance is removed from the sentencing determination, only one aggravating circumstance remains to be weighed against the substantial amount of mitigating evidence presented in this case. The persuasive quality and weight of the sole remaining aggravating circumstance is affected by the fact that the defendant did not personally commit the murder of Amy Lee, one of the murders necessary to support a finding of "mass murder" under T.C.A. § 39–2–203(i)(12) (1982). Furthermore, although not the aggravating circumstance most relied upon by the prosecution during final argument at the penalty phase, the prosecution did briefly emphasize the invalid aggravator in its closing argument. *See Clemons v. Mississippi*, 494 U.S. at 753–754, 110 S.Ct. at 1451. The prosecution also discussed this circumstance and the evidence supporting it in great detail during opening statement at the sentencing hearing. For these reasons we reverse Defendant's sentences as to Amy and Arthur Lee and remand these two cases for re-sentencing.

 The killing of Kai Yin Chuey does, however, evince "depravity of mind" under *State v. Black, supra*. In her case we have a helpless 74–year–old woman, who had already been shot by the Defendant and was lying on the floor unable to protect herself when the Defendant put a gun to the back of her head and shot her a second time. We find the evidence of this brutal and senseless execution of a helpless old woman sufficient to support this aggravating circumstance in the murder of Kai Yin Chuey. *See also State v. Harris*, 839 S.W.2d 54 (Tenn.1992); *State v. Strouth*, 620 S.W.2d 467 (Tenn.1981); *Houston v. State*, 593 S.W.2d 267 (Tenn. 1980).

## XIII. *Instructions by the Trial Court*

The Defendant contends that the giving of an anti-sympathy instruction violated his rights under the state and federal constitutions. Similar arguments were rejected in *State v. Boyd*, 797 S.W.2d 589, 598 (Tenn. 1990); *State v. Payne*, 791 S.W.2d 10, 20 (Tenn.1990); *State v. Porterfield*, 746 S.W.2d 441, 450 (Tenn.1988) (citing *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 [1987] ).

■ The Defendant next avers that the trial court's instructions at sentencing on unanimity of the verdict led the jury to believe they must unanimously agree on mitigating circumstances in violation of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and Tenn. Const. Art. I, §§ 6, 9, 16 and 19. This argument was raised and rejected in *State v. Thompson,* 768 S.W.2d 239, 250–251 (Tenn.1989).

■ The Defendant also alleges that the instruction at sentencing that "the sentence shall be death" violates the state and federal constitutions because it inadequately informed the jury of its discretion and can be interpreted as creating a mandatory death penalty. This argument was rejected in *State v. Boyd,* 797 S.W.2d 589, 596–597 (Tenn.1990).

The Defendant concludes by alleging that the trial court erred by failing to instruct the jury that they should presume the Defendant would actually serve a life sentence if sentenced to life imprisonment. We held such an instruction to be improper in *State v. Melson,* 638 S.W.2d 342, 367 (Tenn.1982). *See also State v. Payne,* 791 S.W.2d 10, 21 (Tenn.1990).

## XIV. *Constitutionality of Tennessee Death Penalty Statute*

Out of an abundance of caution the Defendant has raised six issues challenging the constitutionality of the Tennessee Death Penalty Statute upon various grounds, all of which have been previously determined by this Court. The first contention is that the "shall" language of the statute in T.C.A. § 39–2–203(f) and (g) violates Article I, § 19 of the Tennessee Constitution. This argument was recently rejected in *State v. Black,* 815 S.W.2d 166 (Tenn.1991).

The Defendant's next contention is that the death penalty, as applied in Tennessee, is "cruel and unusual punishment" under both the Eighth Amendment of the United States Constitution and Article I, § 16 of the Tennessee Constitution. Defendant asks this Court to adopt the dissent of Justice Brock in *State v. Dicks,* 615 S.W.2d 126, 132–142 (Tenn.1981). A similar argument was made

in *Black,* 815 S.W.2d at 188–91, and a majority of this Court found no violation of either the state or federal constitution.

The Defendant avers that T.C.A. § 39–2–203 places the burden of proof on the Defendant to prove that mitigating circumstances outweigh aggravating circumstances. This proposition has previously been considered and rejected in *State v. Thompson,* 768 S.W.2d 239, 251–252 (Tenn.1989), and *State v. Boyd,* 797 S.W.2d 589, 595–596 (Tenn.1990).

■ The Defendant alleges that the statute impermissibly interferes with the jury's discretion by creating a "presumption of death." The statute specifically requires that the jury return a sentence of life imprisonment if it determines that no statutory aggravating circumstances have been proved beyond a reasonable doubt, or that a statutory aggravating circumstance or circumstances have been proved beyond a reasonable doubt but said circumstance or circumstances are outweighed by one or more mitigating circumstances. T.C.A. § 39–2–203(f). The statute authorizes the jury to return a sentence of death only if the jury finds that the aggravating circumstance or circumstances which have been proved beyond a reasonable doubt are not outweighed by any mitigating circumstances. T.C.A. § 39–2–203(g). There is no merit to this issue. *See State v. Boyd,* 797 S.W.2d 589, 596–597 (Tenn.1990).

The Defendant's next contention is that the Tennessee Death Penalty Statute is unconstitutional because it fails to apply the reasonable doubt standard to the sentencing determination. This claimed defect is not constitutionally mandated. The Supreme Court of the United States has repeatedly upheld the constitutionality of "weighing" statutes such as the one adopted by Tennessee. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *see also State v. Payne,* 791 S.W.2d 10, 20–21 (Tenn.1990).

The Defendant next complains that the Tennessee Death Penalty Statute does not sufficiently narrow the class of persons eligi-

ble for the death sentence in the case of felony murder. This Court recently addressed this issue in *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992), and upheld the validity of the death penalty under the felony murder statute. A majority of the Court, however, found that T.C.A. §§ 39–2–203(i)(7) (1982) and 39–13–204(i)(7) (1991) do not narrow the class of death eligible murderers sufficiently under the Eighth Amendment to the United States Constitution, and Article I, § 16 of the Tennessee Constitution by using felony murder as an aggravating circumstance and thereby duplicating the elements of the offense. The Court held that "it would simply require that an aggravating circumstance other than that in (i)(7) support the death penalty for a felony murder." In this case the jury found two aggravating circumstances neither of which were (i)(7).

### XV. *Proportionality Review*

■ Under T.C.A. § 39–13–206(c)(1)(D) [formerly T.C.A. § 39–2–205(c)(4) ], this Court is charged with determining whether the sentence of death in each capital case is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Because we find it necessary to remand the cases involving the murders of Arthur and Amy Lee for resentencing, we forego proportionality review in those cases. However, we have examined the killing of Kai Yin Chuey and hold that the penalty imposed in that case is not excessive or disproportionate to the penalty imposed in comparable cases.

The murder of Kai Yin Chuey, as described earlier in this opinion, involved the intentional and senseless killing of a helpless, elderly victim during a robbery. We are not unaware that the nature of the Defendant in this case initially compares favorably with that of other defendants in similar capital cases. The Defendant here had a good employment record as shown by the testimony of the personnel manager and the Defendant's immediate supervisor at his former place of employment. He cooperated with the F.B.I. and expressed remorse for the killings. He is a young man with no prior criminal background. We also recognize his personal history as the child of a Vietnamese mother and an American father, his difficult childhood, and educational problems.

Nevertheless, at the time of Kai Yin Chuey's death, the Defendant had already knowingly and intentionally killed one victim to effectuate a robbery. Whatever might be said about the circumstances of the first killing, the record establishes that, after the struggle with Arthur Lee had ended and the search for the money and gold kept in the restaurant had begun, the Defendant chose without provocation to shoot a second, unresisting victim in the back of the head. We find imposition of the death penalty neither excessive nor disproportionate in the present case under T.C.A. § 39–13–206(c)(1)(D). *See, e.g., State v. Matson*, 666 S.W.2d 41 (Tenn.1984); *State v. Johnson*, 632 S.W.2d 542 (Tenn.1982); *State v. Simon*, 635 S.W.2d 498 (Tenn.1982); *Houston v. State*, 593 S.W.2d 267 (Tenn.1980).

■ Pursuant to the directives of § 39–2–205(c)(4) [as amended now § 39–13–206(c)(1) ], we further find that the sentence of death in the case of Kai Yin Chuey was not imposed in an arbitrary fashion; that the evidence supports the jury's findings of two statutory aggravating circumstances; and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found. We therefore affirm the sentence of death in the case of Kai Yin Chuey.

In summary, we affirm Defendant's convictions of felony murder as to Amy Lee and Arthur Lee but reverse his sentences in those cases and remand for resentencing. We affirm both Defendant's conviction of felony murder and his sentence of death as to Kai Yin Chuey.

The sentence of death will be carried out as provided by law on the 7th day of December, 1993, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

O'BRIEN and ANDERSON, JJ., concur.

REID, C.J., concurs and dissents in separate opinion.

DAUGHTREY, J., dissents in separate opinion.

REID, Chief Justice, concurring and dissenting.

I concur with the majority's holdings that the three convictions of first degree murder be affirmed and that the sentences of death for the murders of Amy Lee and Arthur Lee be reversed, because the evidence is insufficient to support a finding that they were especially heinous, atrocious, or cruel. T.C.A. § 39–2–203(i)(5) (1982).

I also would reverse the sentence of death for the murder of Kai Yin Chuey and impose a sentence of life imprisonment upon each conviction, for the reasons stated in Justice Daughtrey's dissent and for the additional reasons that the evidence is insufficient to support the aggravating circumstance of mass-murder, T.C.A. § 39–13–204(i)(12) (1991) (formerly T.C.A. § 39–2–203(i)(12) (1982)), the proof does not establish that the defendant was death-eligible under the holding of *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), and the sentence of death is disproportionate to the penalty imposed in similar cases, T.C.A. § 39–13–206(c)(1)(D) (1991) (formerly T.C.A. § 39–2–205(c)(4) (1982)).

The evidence summarized in the majority opinion shows that the homicides were committed during a melee that resulted when the four victims forcibly resisted the three would-be robbers turned murderers. The brawl began when one victim, Arthur Lee, grabbed robber Bounnam's hand and elbowed him in the chest. Bounnam fell against another victim, "the old lady," who in turn fell against the defendant, "caus[ing] the gun to go off." Arthur Lee then kicked robber Chung causing him to "shoot one or two times." Then Arthur Lee was shot by Chung when he "tried to grab the gun." When the defendant told Mr. Lee not to try for Chung's gun, Mr. Lee "tried to get [the defendant's] gun" and the defendant shot him. Mr. Lee fell, but "was moving around" and the defendant shot him again. When the defendant walked into another room, he saw

the "old lady roll over." He "thought she had something in her hand" and shot her in the head. Upon leaving the room, the defendant saw Bounnam holding Ging Sam Lee and "told Bounnam not to hurt her." There is no evidence in the record as to who killed Amy Lee, only that she died of a single gunshot wound.

The record shows that the defendant initially intended to rob, not kill. This intent is demonstrated by three incidents that occurred during the event: when the defendant told Arthur Lee not to grab Chung's gun; when he shot the "old lady" only because he thought she had something in her hand; and when he told Bounnam not to hurt Ging Sam Lee. The absence of intent to kill is reflected in the jury's verdict of *not guilty* on the three charges of premeditated murder, and in the jury's finding that the evidence did not support the charge of aggravating circumstance (i)(3), that the defendant *knowingly* created a great risk of death to two or more persons other than the victim during his act of murder.

The majority opinion recognizes that these facts are not sufficient to support the sentence of death as to Arthur Lee or Amy Lee. The evidence found by the majority to be sufficient to justify the death sentence for the murder of Kai Yin Chuey, the victim identified by the defendant as the "old lady," was that she "was lying on the floor unable to protect herself when the defendant put a gun to the back of her head and shot her." Omitted from this account is the defendant's statement that he "thought she had something in her hand." In any event, these facts do not establish a constitutional basis for imposing a sentence of death.

That mass-murder as an aggravating circumstance is unique to Tennessee may be seen as an indication of its lack of usefulness in determining those first-degree murderers who are deserving of death as a punishment. A majority of this Court, after essentially rewriting the statute, found the aggravating circumstance of mass murder to be constitutional in *State v. Bobo,* 727 S.W.2d 945 (Tenn. 1987). Again, a majority of this Court found in *State v. Black,* 815 S.W.2d 166, 184 (Tenn. 1991) that mass murder as an aggravating

circumstance may be applicable to multiple murders "committed close in time." However, neither the language of the statute nor either case demonstrate how this circumstance has, in the words of the dissent in *Bobo*, 727 S.W.2d at 957, added anything of "substance" to the process of narrowing the class of death-eligible murderers. Since its use in this case added nothing to the constitutionally required procedure, reliance upon mass murder as justification for the sentence of death was error of constitutional dimension. *Middlebrooks v. State*, 840 S.W.2d at 345–46.

For the reasons stated above and also those stated in Justice Daughtrey's dissent, the facts of this case do not show that the defendant is a member of the death-eligible class of murderers. In *Middlebrooks v. State*, the Court articulated the standards of proof required to impose a sentence of death. The Court found that the imposition of a sentence of death upon a conviction of felony murder does not, *per se*, violate the constitutional prohibition against cruel and unusual punishment. *Id.* at 323. However, in that case the Court also found that for a sentence of death to be valid, the aggravating circumstances must in fact narrow the class of death-eligible persons. The Court stated as follows:

> As a constitutionally necessary first step under the Eighth Amendment, the Supreme Court has required the states to narrow the sentencers' consideration of the death penalty to a smaller, more culpable class of homicide defendants than the pre-*Furman* class of death-eligible murderers. A state, however, must not only genuinely narrow the class of death eligible defendants, but must do so in a way that reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. A proper narrowing device, therefore, provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not, and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed. As a result, a proper narrow-

ing device insures that, even though some defendants who fall within the restricted class of death-eligible defendants manage to avoid the death penalty, those who receive it will be among the worst murderers—those whose crimes are particularly serious, or for which the death penalty is peculiarly appropriate.

*Id.* at 343 (citations omitted).

The aggravating circumstances found by the jury in this case do not, in fact, narrow the class of death-eligible defendants, and the imposition of the sentence of death violates the constitutional prohibition against cruel and unusual punishment.

I also would hold that the majority's comparative proportionality review does not meet the standards set forth in T.C.A. § 39–13–206(c)(1)(D), which requires a consideration of "both the nature of the crime and the defendant." *See State v. Harris*, 839 S.W.2d 54, 84–85 (Tenn.1992) (Reid, C.J., dissenting). The proportionality review in this case is entirely conclusory. It merely recites, in summary fashion, the facts of the killing and then states as justification for the sentence of death, that "the defendant chose without provocation to shoot a second, unresisting victim in the back of the head." Even here, the majority omits, perhaps as being immaterial, that the defendant thought the victim had something in her hand. The record falls far short of establishing the crime to be, in comparison with other first-degree murders, one of the most egregious.

The defendant, as a person, obviously is not one of the worst of the bad. He is a native of Vietnam and, at the time the murders were committed, he was 20 years of age. He was the child of a Vietnamese woman and an American soldier who died in Vietnam in 1968. When the defendant was a small child, he was very sick and did not talk until he was six years of age. According to the clinical psychologist and professor of psychiatry at the University of Tennessee Medical School who had interviewed and tested the defendant, the defendant described to him a very difficult childhood in Vietnam, where he had lived in an orphanage and also with an aunt, who disciplined him by tying him naked to a

tree where ants bit him. According to his account to the psychiatrist, the defendant had lived for some time on the street and had become exposed to marijuana at an early age. He stopped school when Saigon fell in 1975.

Under the auspices of a program sponsored by the Catholic Church, the defendant and his mother arrived in Memphis in 1983, when he was 17 years of age. He dropped out of school after one year. His American sponsor, Mrs. Mitchell, testified that the defendant lived with her for one and a half years, during which time he cooked and cared for Mrs. Mitchell, who was ill with cancer, and her children. She described the defendant as "very, very humble" and honest. The personnel manager of the defendant's former employer and his immediate supervisor described him as a very good employee, responsible and well-mannered. An FBI agent testified that he had cooperated with the FBI in their search for Chung and Bounnam. The defendant had no prior criminal record or history of arrest. The psychiatrist described the defendant as depressed, suffering from low esteem, and truly remorseful for the crimes he had committed. This is not the portrait of a person for whom, pursuant to a rigorous and searching proportionality review, the death sentence is warranted.

The process followed by the majority in its proportionality review and the proof relied upon in affirming the sentence of death are further subject to the criticisms made in *Middlebrooks v. State*, 840 S.W.2d at 354–55 (Reid, C.J., concurring and dissenting).

I would reverse the sentence of death and impose three sentences of life imprisonment.

DAUGHTREY, Justice, dissenting.

There are several aspects of this appeal that are troubling. In my judgment, the trial court's failure to permit individual voir dire of the jury under the circumstances of this case (or to change the venue of the trial),

the failure to mute the audio portion of the videotape of the crime scene when it was shown to the jury, and the failure to provide an independent, unbiased interpreter for the only eye-witness who testified at trial constitute such substantial errors that they cannot be brushed aside as merely harmless, especially in a case in which the death penalty is sought. These errors undermine confidence in the integrity of the defendant's conviction for first-degree murder. But, the single most obvious (and prejudicial) error in the record now before us is the trial court's faulty instruction to the jury at the sentencing phase of the trial, regarding the basis for imposition of the death penalty.

At the time of this trial, the aggravating circumstance in question, T.C.A. § 39–2–203(i)(5) (1982), encompassed a murder that was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Having correctly concluded that, under Tennessee law, the murders for which Heck Van Tran had been convicted did not involve "torture," the trial judge truncated the statutory language of subsection (i)(5) and charged the jury that it could find as an aggravating circumstance that the murder of each victim "was especially cruel in that it involved depravity of mind."

Many challenges for vagueness and overbreadth have been mounted against Tennessee's "heinous, atrocious and cruel" aggravating circumstance, beginning as early as 1981. *See e.g., State v. Dicks*, 615 S.W.2d 126, 131–32 (Tenn.1981). None, so far, have been successful.[1] Perhaps the most complete discussion of circumstance (i)(5) to date is found in *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), in which the Court based its interpretation of the language of circumstance (i)(5) on dictionary definitions of the terms found in that subsection of the statute, as follows:

The words of the statute must be given their ordinary and natural meaning. In determining that meaning, we refer to the

---

1. This uniform result in Tennessee should not be taken as a signal that such statutory provisions are uniformly accepted by courts or commentators. For a full analysis, *see* Rosen, The "Especially Heinous" Aggravating Circumstance in Capital Cases—the Standardless Standard, 64 N.C.L.Rev. 941 (1986). *But see Arave v. Creech*, — U.S. —, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

*American Heritage Dictionary of the English Language* where we find the following definitions:

> Heinous—"Grossly wicked or reprehensible; abominable; odious; vile."
> Atrocious—"Extremely evil or cruel; monstrous; exceptionally bad; abominable."
> Cruel—Disposed to inflict pain or suffering; causing suffering; painful."
> Torture:—"The infliction of severe physical pain as a means of punishment or coercion; the experience of this; mental anguish; any method or thing that causes such pain or anguish; to inflict with great physical or mental pain."
> Depravity—"Moral corruption; wicked or perverse act."

Our statute provides that it is *the murder* which must be *especially* heinous, atrocious, or cruel. The second clause of this statutory provision, *viz.*, "... in that it involved torture or depravity of mind," qualifies, limits and restricts the preceding words "especially heinous, atrocious or cruel." This second clause means that to show that the murder was especially heinous, atrocious or cruel the State must prove that it involved torture of the victim or depravity of mind of the killer.

"Torture" means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.

However, we hold that "depravity of mind" may, in some circumstances, be shown although torture, as hereinabove defined, did not occur. If acts occurring after the death of the victim are relied upon to show depravity of mind of the murderer, such acts must be shown to have occurred so close to the time of the victim's death, and must have been of such

a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim. This is true because it is "the murderer's state of mind *at the time of the killing*" which must be shown to have been depraved. (Emphasis supplied.) *State v. Lujan* [124 Ariz. 365, 604 P.2d 629 (1979) ] *supra; State v. Ortiz* [131 Ariz. 195, 639 P.2d 1020 (1981) ], *supra.*

*Williams,* 690 S.W.2d at 529–30.[2]

From this discussion, it can be gleaned that there are two aspects to circumstance (i)(5)—one objective and the other subjective. In order to establish that a murder is "cruel," it must be shown that objective conduct by the defendant resulted in "torture" to the victim. On the other hand, to demonstrate that it is "heinous or atrocious," the proof must establish the defendant's "depravity" as a subjective state of mind. *Cf. State v. Graham,* 135 Ariz. 209, 212, 660 P.2d 460, 463 (1983), in which the Arizona Supreme Court, interpreting a similar statutory provision, held that "cruelty" involves the pain and distress visited on the victim, while the terms "depraved" and "heinous" go to the perpetrator's mental state and attitude, as reflected in his words and actions.

According to *Williams,* the "apples" of objectivity can be mixed with the "oranges" of subjectivity, but only to a limited extent: torture *can* be used to establish depravity of mind, on the theory that one must be depraved to engage in the torture of another human being. But there is nothing in *Williams* that would authorize the specific instruction given the jury in this case, *i.e.,* that cruelty could be shown by nothing more than "depravity of mind." In this convolution of subsection (i)(5), the subjective state of mind would be used to establish the existence of an objective result, cruelty, and would thus, proverbially, "mix apples with oranges."

Such a result is clearly improper. Cruelty, as defined in *Williams,* requires the infliction of pain and suffering, or torture. It is not

---

**2.** The specific issue in *Williams* was whether mutilation of the victim's body committed after death occurred could be considered "heinous, atrocious or cruel" and thus qualify Williams for the death penalty.

defined by *Williams* in the same terms as depravity of mind, although heinousness and atrocity are. Moreover, in legislative action that appears to concede the vague nature of the term "depravity," the Tennessee General Assembly eliminated that element of circumstance (i)(5) in 1989 and reworded the subsection so that it now reads: "The murder was especially heinous, atrocious, or cruel in that it involved torture *or serious physical abuse beyond that necessary to produce death.*" T.C.A. § 39–13–204(i)(5) (Supp.1990) (emphasis added). Thus, an entirely subjective standard may no longer be used as the basis for imposition of the death penalty in Tennessee.

The new, wholly objective standard is obviously an improvement, in terms of clarity and rationality. But it may do no more than restate what has been the law in Tennessee since the Court first passed on the constitutionality of circumstance (i)(5) in 1981, in *State v. Dicks.* In that case, the Court noted that Tennessee's "heinous, atrocious and cruel" circumstance was similar to those in Florida and Georgia that had been approved by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Going farther, we specifically "approved" the construction placed on the Florida statute by the Florida Supreme Court in *State v. Dixon,* 283 So.2d 1, 9 (Fla.1973), to the effect that this type of aggravating circumstance was directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Dicks,* 615 S.W.2d at 131–32.

There was no proof of "unnecessary torture" or excessive physical abuse of the victims in this case. The proof shows that Amy Lee was shot once in the head, "execution style"; Kai Yin Chuey suffered a potentially fatal wound to her throat and at about the same time was fatally shot in the back of the head, "execution-style," by the defendant. The two women were rendered immediately unconscious by these wounds. Arthur Lee suffered eight bullet wounds as the result of his attempts to seize his assailants' guns. The defendant admitted shooting Lee point blank in the head, which would have rendered Lee immediately unconscious. Hence, the killing of Arthur Lee does not involve "depravity of mind" beyond that found in any first-degree murder. Indeed, the fact that the defendant told Bounnam not to kill Ging Sam Lee and the fact that the shooting may have been precipitated by Arthur's struggle are both factors against a finding of "depravity."

As previously noted, the facts in this record do not establish "cruelty," as that term is defined in *Williams* to require the infliction of pain and suffering. Certainly they do not meet the test of *State v. Dixon.* Rather, in this case, where there was no "torture" shown (and thus the sole basis for an instruction under subsection (i)(5) was the defendant's alleged "depravity of mind"), and where the victims did not suffer pain beyond that experienced in any death by gunfire, the more applicable terms in (i)(5) would have been "heinous" and "atrocious," rather than "cruel." By truncating the instruction as he did, the trial judge may have confused the jury. Certainly, this flawed instruction, coupled with Dr. Smith's testimony, may well have directed the jurors' attention *away* from the state of the defendant's mind at the time of the murders, which was ostensibly the relevant aspect of the charge, and directed it *toward* the physical effect of murder on the victims, which, strictly speaking, was not relevant.

But even if this confusion of terms in the instruction could be overlooked, as the majority proposes, there remains a serious constitutional question about reliance on a defendant's "depravity of mind" as a circumstance supporting imposition of the death penalty. As noted previously, we have defined depravity in only the vaguest of terms, as conduct evincing "moral corruption" or constituting a "wicked or perverse act." *Williams,* 690 S.W.2d at 529. We have developed no standards for determining the existence of a depraved, morally corrupt, wicked or perverse act, other than to say that it is necessarily proven whenever the state proves torture of the victim, and that it "*may,* in some circumstances, be shown although torture, as hereinabove defined, did not occur." *Id.* (empha-

sis added). Based on Tennessee case law, that is *all* we know about what is legally required to prove "depravity," except for the ruling in *Williams* that depraved acts occurring after death "must be shown to have occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal blows were inflicted upon the victim." *Id.* at 530. Of course, this latter restriction governs the timing of a "wicked act" alleged to reflect depravity, but it adds nothing that would help a fact-finder determine *whether* the murder in question was actually the product of a depraved mind, that is, whether it was "morally corrupt" or "wicked."

Because the "depravity of mind" prong of aggravated circumstance (i)(5) is so vague, the instruction given in this case allowed the jury to exercise the sort of unguided discretion condemned by the United States Supreme Court in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In *Godfrey,* the defendant murdered his wife and mother-in-law with single shotgun blasts. The prosecutor did not allege that torture occurred, yet sought the death penalty under Georgia's statute permitting it when a murder is "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The jury sentenced the defendant to death based on a truncated version of the statute, stating that the murders were "outrageously or wantonly vile, horrible and inhuman." In its review, the United States Supreme Court found that the jury's version of the statute was an unconstitutional basis for imposing the death penalty, because there is "nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.* at 428, 100 S.Ct. at 1765. Holding that Godfrey's "crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder," the Court reversed the death sentence. *Id.* at 443, 100 S.Ct. at 1772. The Court concluded that "[t]here is

no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.*

In *Maynard v. Cartwright,* another shotgun murder not involving torture or aggravated battery of the victim, the Court found *Godfrey* to be "very relevant" as it reviewed Oklahoma's statute allowing a death sentence to be imposed for murders that are "especially heinous, atrocious, or cruel." The Court observed that *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972), requires "the channeling and limiting of the sentencer's discretion in imposing the death penalty." *See Maynard,* 486 U.S. at 362, 108 S.Ct. at 1858. It further noted that *Godfrey* "rejected the submission that a particular set of facts surrounding a murder, however shocking they might be, were enough in themselves, and without some narrowing principle to apply to those facts, to warrant the imposition of the death penalty." *Id.* at 363, 108 S.Ct. at 1859. The Court in *Maynard* ultimately held that the Oklahoma statute "gave no more guidance than the ... language that the jury returned in its verdict in *Godfrey,*" and that appellate review of the facts "did not cure the constitutional infirmity of the aggravating circumstance." *Id.* 486 U.S. at 364, 108 S.Ct. at 1859.

It is true that since the release of *Maynard,* we have reviewed and upheld the constitutionality of circumstance (i)(5) against challenges for vagueness, distinguishing the Tennessee statute on the theory that it, unlike the Georgia and Oklahoma statutes, qualified the terms "heinous, atrocious or cruel" by requiring a finding of "torture or depravity of mind" to support the existence of the circumstance. *See, e.g., Williams,* 690 S.W.2d at 527; *State v. Teel,* 793 S.W.2d 236, 251 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *State v. Henley,* 774 S.W.2d 908, 918 (Tenn.1989), *cert denied,* 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 800 (1990); and *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990). This distinction may be sound, to the extent that "torture" can be defined in terms that will guide the jury in making a subsection (i)(5) determination. It is not val-

id in a case, like the one now before us, in which the jury is asked to determine only whether the record reflects "depravity of mind" and in which that term is defined for the jury in the amorphous terms of *Williams, i.e.,* "wickedness," "perversity," and "moral corruption." Such undefined (and apparently indefinable) terms, without explication of what factor or factors must be present in order to establish depravity, renders the Tennessee capital punishment scheme unconstitutionally vague, to the extent that a sentence is based on circumstance (i)(5).

Recent rulings by the United States Supreme Court indicate that when a capital case is submitted to a jury on alternative theories, the unconstitutionality of any of the theories requires that the conviction or verdict be set aside where the reviewing court is uncertain as to which theory was relied on by the jury in reaching its verdict. *See e.g., Shell v. Mississippi,* 498 U.S. 1, 3, 111 S.Ct. 313, 314, 112 L.Ed.2d 1 (1990) (Marshall, J., concurring); *Mills v. Maryland,* 486 U.S. 367, 376-7, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988); *Leary v. United States,* 395 U.S. 6, 30-32, 89 S.Ct. 1532, 1545-46, 23 L.Ed.2d 57 (1969); *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

Except for the discussion in *Williams,* this Court has never expressly set forth any standards for what *must* be shown to establish depravity of mind. Other than abuse of the body close to the time of death, *State v. O'Guinn,* 709 S.W.2d 561, 567-568 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986); *State v. Williams,* 690 S.W.2d at 529-530, the Court, in determining if depravity of mind has been proved, has referred to "vicious and massive stab wounds" to the body, *State v. Miller,* 771 S.W.2d 401, 405 (Tenn.1989), *cert denied,* 497 U.S. 1031, 110 S.Ct. 3292, 111 L.Ed.2d 801 (1990); repeated striking of the victim, *State v. Melson,* 638 S.W.2d 342, 367 (Tenn.1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); the senselessness of the killing, *State v. Thompson,* 768 S.W.2d 239,

252 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990); and the gratuitous infliction of violence and needless mutilation of a fatally wounded and helpless victim, *State v. Zagorski,* 701 S.W.2d 808, 814 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986), as evidence of depravity. The Oklahoma court's similar description of the killing, however, was found not to cure the constitutional infirmity of the aggravating circumstance in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853.

The majority in this case refers to the botched (i)(5) jury instruction as harmless error. However, it is apparent from the United States Supreme Court decisions that the sentencer in a capital trial (the jury in Tennessee) must be adequately informed of the constitutionally limiting construction of a vague term used as a capital aggravator. *See Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313; *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853; *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759. Where a sentencer in a "weighing" state, one that requires the weighing of aggravating and mitigating factors, weighs an invalid circumstance, the Eighth Amendment is violated. *Espinosa v. Florida,* — U.S. —, —, 112 S.Ct. 2926, 2928, 120 L.Ed.2d 854 (1992); *Clemons v. Mississippi,* 494 U.S. 738, 752, 110 S.Ct. 1441, 1450, 108 L.Ed.2d 725 (1990). An aggravating circumstance is invalid if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor. *Stringer v. Black,* — U.S. —, —, 112 S.Ct. 1130, 1140, 117 L.Ed.2d 367 (1992).

It is possible for an appellate court in a weighing state like Tennessee to affirm the death penalty, but it can do so only by constitutional harmless error analysis or a reweighing of aggravating and mitigating circumstances at the trial or appellate level. *Stringer v. Black,* — U.S. at —, 112 S.Ct. at 1137; *Clemons v. Mississippi,* 494 U.S. at 750-3, 110 S.Ct. at 1449-51.[3] The appellate

3. In *Clemons,* the Supreme Court appeared to approve two harmless error analyses. The first would ask whether it was beyond a reasonable doubt that the sentence would have been the

same even if there had been no "especially heinous" instruction at all and only the valid aggravating circumstance was to be balanced against the mitigating circumstances. The second in-

court must make a thorough analysis of the role the invalid aggravating circumstance played in the sentencing process and may not automatically assume that the invalid factor has not infected the weighing process. *Stringer v. Black,* —— U.S. at —— - ——, 112 S.Ct. at 1136–7. At the present time, the United States Supreme Court has indicated that it will require that the process by which the appellate court in a weighing state examines a death sentence skewed by an invalid mitigator must be clearly stated and explained. *See Richmond v. Lewis,* —— U.S. ——, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992) (reweighing); *Sochor v. Florida,* —— U.S. ——, ——, 112 S.Ct. 2114, 2123, 119 L.Ed.2d 326 (1992) (appellate court must clearly indicate that harmless error analysis is being made); *see also Clemons v. Mississippi,* 494 U.S. at 753, 110 S.Ct. at 1451 (under certain circumstances "it would require a detailed explanation based on the record" for the Court to agree that the error in giving the "especially heinous" instruction was harmless). To the extent that *Williams* appears to have defined "torture" in specific terms that can be explained to a jury, circumstance (i)(5) may be upheld as constitutional. But where, as here, "depravity of mind" is the *only* basis submitted to the jury to support a finding under subsection (i)(5), the constitutional validity of the resulting sentence is highly doubtful, in the absence of a consistent standard that can be applied to determine whether the murder resulted from "depravity." None has been developed by the Court to date—certainly none was supplied to the jury in this case—and given the fact

that the "heinous, atrocious or cruel" circumstance was submitted on the "depravity of mind" prong only, the sentence in this case should not be permitted to stand.

As pointed out above, the Tennessee General Assembly has implicitly recognized the uncertainty inherent in the "depravity" language formerly found in subsection (i)(5), and has substituted a new, objective standard, as follows:

> The murder was especially heinous, atrocious, or cruel in that it involved torture or *serious physical abuse beyond that necessary to produce death.*

T.C.A. § 39–13–204(i)(5) (Supp.1990) (emphasis added). This change constitutes sound policy, and I believe that it should be recognized as a constitutional mandate by this Court and applied in this case.

The result would be a remand for resentencing under a proper subsection (i)(5) instruction, at least as to those counts in which the proof is arguably sufficient to support the death penalty. Otherwise, the proper procedure would be for the Court to set aside the sentences of death set in the trial court and impose life sentences against the defendant.

For these reasons, I respectfully dissent from the majority opinion.

---

volves an inquiry as to whether beyond a reasonable doubt the result would have been the same had the especially heinous aggravating circumstance been properly defined in the jury instructions, 494 U.S. at 753–4, 110 S.Ct. at 1451. In *Sochor v. Florida,* —— U.S. ——, ——, 112 S.Ct. 2114, 2123, 119 L.Ed.2d 326 (1992), the Su-

preme Court reiterated that the appellate court must conclude beyond a reasonable doubt that the constitutional error did not contribute to the sentence obtained.