# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 20, 2004 Session

## ROGER LEE WILSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Anderson County**
**No. A2CR0017     James B. Scott, Jr., Judge**

---

**No. E2003-01378-CCA-R3-PC - Filed July 8, 2004**

---

Petitioner, Roger Lee Wilson, was indicted by the Anderson County Grand Jury on 28 counts, including charges of child rape, aggravated sexual battery, and statutory rape, and against multiple victims. The trial court severed the counts, and count five was the only count to be tried by a jury. The jury found Petitioner guilty of the charged offense of rape of a child. Following the jury trial, Petitioner entered "best interest" guilty pleas to several other counts, and the remaining counts were dismissed by *nolle prosequi*. Pursuant to the negotiated plea agreement, Petitioner waived his right to a direct appeal from his conviction and sentence in count five. For all of his convictions, Petitioner received an effective sentence of 22 years. Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective. Specifically, Petitioner argues that trial counsel was ineffective for failing to raise as an issue at trial that there was a fatal variance between the indictment and the proof; failing to call Hubert Wallace, Art Moore, and Dwayne Wilson as witnesses at trial; and requesting to reserve his opening statement until after the close of the State's proof. Petitioner also argues that his counsel who withdrew from representation prior to trial was ineffective for misplacing evidence. Finally, Petitioner argues that his guilty pleas were not knowingly and voluntarily entered, and that the waiver of his right to appeal is not valid. The trial court denied post-conviction relief and Petitioner appeals. After reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

David A. Stuart, Clinton, Tennessee, for the appellant, Roger Lee Wilson.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; James N. Ramsey, District Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**Factual Background**

A jury trial was conducted on October 17-18, 2000, on count five of the indictment, which alleged rape of a child in violation of Tenn. Code Ann. § 39-13-522. April Yarber, the mother of the victim in this case, testified that Hubert Wallace is the victim's father. She testified that the victim was twelve years old at the time of trial. Ms. Yarber testified that Petitioner lived with her mother, Sandra York, at Ms. York's residence on Half Moon Road. The victim called Ms. York and Petitioner "Mawmaw" and "Pawpaw," respectively. Ms. Yarber testified that Petitioner mowed lawns during the summer and fall of 1998. Sometime during that time period, Petitioner gave the victim "a little green alien" glow-in-the-dark key chain. Following the alleged incident, Ms. Yarber noticed a change in the victim's behavior. She testified that the victim "closed up" and acted "more babyish." In 1999, Ms. Yarber took the victim to Children's Hospital, where she was examined by Dr. Ford. Ms. Yarber directed the victim to tell the doctor the truth concerning any sexual abuse. Ms. Yarber testified that the victim was receiving psychological counseling for her abuse. She also testified that Ms. York owned a white, two-door Oldsmobile.

Mary Ann Phillips, the victim's step-sister, testified that Petitioner bought her and the victim "Halloween toy[s]" that she described as "green alien[s]." She and the victim put the toys in the river. The victim tore the head off of her toy and put it in the river to see if it would float.

The victim testified that she was twelve years old at the time of the trial. She testified that Petitioner lived with her grandmother in 1998, when the victim was in the fourth grade. The victim sometimes helped Petitioner mow lawns. She testified that on the date of the incident, she and Petitioner had returned from mowing lawns in a white car with blue seats that belonged to her grandmother. The victim was wearing shorts and a short-sleeve shirt. Petitioner parked the vehicle on the side of the road near the victim's grandmother's house. Petitioner told the victim that he had pulled over because he "heard a big ol' boom." Petitioner pulled down the victim's shorts and panties and unzipped his own pants. The victim testified that Petitioner penetrated her, and "white stuff came out of him." The victim testified that it caused her to bleed and she cried. She testified that Petitioner gave her a napkin to clean herself. Petitioner then drove to the victim's grandmother's house. The victim testified that she did not tell her grandmother about the incident. Petitioner bought the victim a "little alien, glow-in-the-dark" key chain on the day after the incident occurred. The victim testified that before the incident, she felt "okay" about Petitioner, and after the incident occurred, the victim testified, Petitioner "was a devil."

On cross-examination, the victim denied having told the doctor who examined her that the incident occurred at her grandmother's house. She also denied having told anyone that Petitioner asked her to pull down her shorts and panties and that she did so herself. The victim testified that she gave Petitioner and her grandmother a card, in which she wrote, "I love you, Papaw. I love you, Mawmaw." Initially, the victim testified that she gave the card to them after the incident occurred,

and she later changed her testimony, stating that she gave the card to them before the incident occurred.

Captain Penny Baker, of the Anderson County Sheriff's Department, testified that she has investigated approximately 1,700 cases of child sexual abuse. Captain Baker took the victim to the location on Half Moon Road where the victim alleged the incident occurred. The victim testified that the area had changed since 1998, when the incident occurred, and new homes have since been built there.

Dr. Ronald Ford, a pediatrician, examined the victim on April 29, 1999, when the victim was ten years old. Dr. Ford interviewed the victim alone, outside the presence of the victim's mother, and the victim told Dr. Ford that Petitioner had "opened his fly and pulled down her pants and then put his private in [her]." The victim also stated that "some white stuff had come out of his private" onto the seat near her. The victim also stated that the abuse was painful and caused her bleeding. The victim told Dr. Ford that the incident occurred "at Mawmaw's house, home." A physical examination of the victim revealed an absence of the victim's hymenal tissue. Dr. Ford concluded that the victim had been sexually molested. Dr. Ford advised the victim's mother that she follow a "safety plan" and discontinue any contact between the victim and Petitioner.

Sandy York, the victim's grandmother, testified that Petitioner had been living at her residence for five years. The victim also resided with Ms. York during the summer and fall of 1998. The victim sometimes helped Petitioner mow lawns. Ms. York testified that she owned a white Oldsmobile that had been broken down for three years. She testified that while the victim lived with her, she never observed the victim in fear of Petitioner. The victim was upset when she moved from Ms. York's house in early 1999. Subsequent to the victim being removed from Ms. York's home, the victim's mother called Petitioner and asked him to take her to pick up her van that was being repaired. Petitioner drove Ms. York, Ms. Yarber, and the victim to pick up Ms. Yarber's van in Oak Ridge, Tennessee.

Petitioner testified that he had lived with Ms. York at her residence on Half Moon Road since 1997. Petitioner testified that during the entire time that the victim lived there, the white Oldsmobile was not running. Regarding the occasion when Petitioner drove Ms. Yarber to pick up her vehicle, Petitioner told Ms. York that he was "not supposed to be around [the victim]," stating, "I don't think it's right."

In rebuttal, Ms. Yarber testified that the white Oldsmobile was operating in 1998 and that she had driven the vehicle during that time period. She also testified that she did not allow the victim to have any contact with Petitioner after the allegation of sexual abuse arose.

**Post-Conviction Hearing**

At the post-conviction hearing, Assistant Public Defender Nancy Meyer testified that she was appointed to represent Petitioner in this case. Ms. Meyer later withdrew from her representation of

Petitioner because a conflict existed. Ms. Meyer testified that the public defender's office also represented Hubert Wallace, the father of one of the victims in Petitioner's case. Ms. Meyer testified that during her representation, Petitioner gave her notes and letters written by some of the victims, expressing affection for Petitioner. When Petitioner was appointed new counsel, Ms. Meyer gave the information contained in Petitioner's file to either Petitioner or his new counsel. However, Ms. Meyer testified, her office manager discovered some of the letters and notes in a file cabinet two weeks prior to the post-conviction hearing.

Hubert Wallace testified that Art Moore told him in jail that Mr. Wallace's daughter had been molested. Mr. Wallace testified that during the trial in this case, he followed Petitioner into the hallway outside of the courtroom, and Petitioner said, "I'm not the one who molested your daughters." Mr. Wallace testified that Petitioner also said, "You need to be looking into where they are being raised up at."

Art Moore testified that his mother, Sandy York, dated Petitioner for a period of time prior to the offense that was the subject of the jury trial. Mr. Moore testified that a white, two-door, 1987 Olds Cutlass had been parked at his mother's residence while Petitioner lived there and that the vehicle was not running at the time. Mr. Moore was serving a sentence in Anderson County Jail while Hubert Wallace was also serving a sentence there. On cross-examination, Mr. Moore admitted that he had several prior convictions for theft.

Kevin Angel represented Petitioner at the jury trial in this case. Mr. Angel testified that Lee Hunt had been appointed to represent Petitioner after Ms. Meyer withdrew, and Mr. Hunt subsequently withdrew. Mr. Angel examined both Mr. Hunt's and Ms. Meyer's files and took from them what he believed to be relevant. Mr. Angel testified that Petitioner indicated to him that Mr. Hunt had the cards and letters that he intended to introduce as exhibits at trial. Mr. Angel testified that even if he had been in possession of the cards and letters discovered by Ms. Meyer's office manager, he would not have attempted to introduce all of them at trial because they were not all written by the victim of the offense that was the subject of the jury trial in this case.

At trial, Mr. Angel introduced a card given to Petitioner by the victim and expressing affection towards Petitioner. On cross-examination, the victim testified that she had written a card to Petitioner and Ms. York, stating, "I love you, Pawpaw. I love you, Mamaw." The card was not dated, however, and the victim equivocated in her testimony of when she gave them the card in relation to the offense. Mr. Angel testified that he did not question Petitioner about the card at trial because "if [Petitioner] was honest and said that it was sent before he had been charged, it would hurt our case. . . . If he was dishonest, I would have to withdraw because I would know that he committed perjury." Mr. Angel testified that the cards and letters that Ms. Meyer's office manager discovered after the jury trial in this case were also not dated.

Mr. Angel testified that Petitioner informed him prior to trial that Hubert Wallace had "told someone at the jail that he knows [Petitioner] didn't do it and he knows who did." Mr. Angel attempted to contact Mr. Wallace, but he was unable to do so. Mr. Angel contacted Mr. Wallace's

probation officer and the court clerk. Both sources reported Mr. Wallace's address as "Black Oak Grove Trailer Park." Mr. Angel went to that address, but Mr. Wallace no longer lived there. Mr. Angel asked Petitioner if he had any information on Mr. Wallace's whereabouts, but Petitioner did not know how to contact Mr. Wallace.

Before the trial began, Mr. Angel advised Petitioner to write down any questions he had regarding any of the witnesses' testimony. When the victim was questioned on direct examination concerning the vehicle in which she testified the incident happened, Petitioner did not make any notes or mention anything to Mr. Angel about the car having been inoperable. Mr. Angel testified that he did not cross-examine the victim concerning the car. On the morning of the second day of Petitioner's two-day trial, Petitioner and Ms. York both approached Mr. Angel outside of the courthouse and told him that the vehicle in which the rape allegedly occurred was inoperable at the time of the offense. On direct examination, Mr. Angel asked Ms. York about the vehicle, and she testified that it had not been running for three years. Mr. Angel testified that he would have called Art Moore to corroborate Ms. York's and Petitioner's testimony, but Petitioner did not inform him that Mr. Moore could offer such testimony. Mr. Angel did not examine the vehicle for evidence.

Mr. Angel testified that he attempted to impeach the victim through the testimony of the examining doctor, who testified that the victim had stated to him that the incident occurred at the residence of her grandmother, Sandy York. The victim testified at trial that the incident occurred inside the car, which was parked somewhere near her grandmother's house.

After Petitioner was convicted by a jury, attorney Bill Pratt was appointed to represent Petitioner as co-counsel. Mr. Angel prepared a waiver of trial by jury, requesting the trial court's acceptance of guilty pleas to several other counts alleged in the indictment. Mr. Angel testified that Mr. Pratt reviewed the guilty plea with Petitioner. Mr. Angel testified that Mr. Pratt explained to Petitioner that by pleading guilty, Petitioner was waiving his right to appeal the conviction or sentence resulting from the jury trial on count five in exchange for a recommended sentence in the other counts. Mr. Angel testified that because of an "oversight," the waiver was not signed by either Mr. Angel or Mr. Pratt.

Mr. Angel testified that he met with Petitioner several times at his office, and he testified that he did not "feel that [Petitioner] communicated well with [him]." Mr. Angel testified that Petitioner never complained about not being able to read or see properly. Mr. Angel testified that he knew that Petitioner's education was "limited," and considered him to be intellectually "very limited." Mr. Angel also testified that Petitioner expressed a desire to call several "character" witnesses as part of his defense. Mr. Angel explained to Petitioner that he had been indicted on twenty-seven other counts, and only one count was being tried by a jury, and Mr. Angel advised Petitioner that introducing such character evidence might "open the door" to questions regarding the other counts. Mr. Angel testified that Petitioner never complained to him about his representation, but during Mr. Angel's second or third visit to Petitioner in jail after the jury verdict, Petitioner complained that the evidence did not support a conviction.

Dwayne Wilson, Petitioner's thirteen-year old son, testified that in November of 1998, he lived with Petitioner and Sandy York in Ms. York's trailer on Half Moon Road. Dwayne testified that the victim in this case would sometimes get off of the school bus at Ms. York's residence after school. Dwayne also testified that a white Oldsmobile was parked at Ms. York's house in November, 1998, and the car did not run. He testified that the "plugs" were disconnected, the engine was missing bolts, the tires were flat, and the car "was just really run down." Dewayne testified that he mowed lawns with Petitioner. Petitioner also took the victim to mow lawns with him occasionally. Petitioner drove a brown van with a white stripe to mow lawns. Dwayne testified that he knew Jason and Art Moore, sons of Sandy York. He testified that Jason Moore sometimes took the victim on walks in the woods. He also testified that before Petitioner's trial in this case, Jason Moore watched pay-per-view television, while in the presence of him and the victim, that showed men and women having sex. Dwayne testified that Kevin Angel never interviewed him. Dwayne testified that he told Ms. York, whom he called "Mawmaw," about having watched pornographic movies with Jason Moore. Dwayne also testified that Petitioner took him and the victim and her sisters on a camping trip.

Barry Pelizzari, the Circuit Court Clerk for Anderson County, testified that various arrest warrants issued for Hubert Wallace prior to Petitioner's trial in this case showed multiple addresses for Mr. Wallace. The most recent arrest warrant for Mr. Wallace was issued on June 15, 2000, and it stated that Mr. Wallace lived at Lot 17, Black Oak Trailer Park in Clinton, Tennessee.

Amy Morris, the custodian of records at the Anderson County Detention Facility, testified that Mr. Wallace's address on June 15, 2000, was 289 Robertsville Road in Oak Ridge, Tennessee.

Petitioner testified that he was 49 years old. He testified that he was educated through the ninth grade and that he could not read and write very well. Petitioner testified that he told his trial counsel, Kevin Angel, that Hubert Wallace might have information that could help his defense. Petitioner testified that during his trial, Hubert Wallace approached him in the hallway outside of the courtroom and said, "I know you didn't do it, but I think I know who did." Mr. Wallace then told Petitioner, "I can't talk to you no more," and left. Petitioner testified that he never spoke to or saw Mr. Wallace again. Petitioner testified that prior to trial, he learned that the victim had claimed that Petitioner had raped her inside the white Oldsmobile car parked at Sandy York's residence. Petitioner "tried to tell everybody [including trial counsel] that was impossible."

Petitioner testified that he cannot read without his glasses, which he obtained while incarcerated at Brushy Mountain Correctional Facility. Petitioner did not wear glasses at the time of his trial or guilty plea hearing. Upon being questioned by the trial court during the post-conviction hearing, Petitioner testified as follows:

> [Trial court]: Are you telling me that when you had these [guilty plea] papers submitted to you, you could not see them?
>
> [Petitioner]: No, Your Honor, I could not see none of that. I told them that.

| | |
|---|---|
| [Trial court]: | Well, why in the world did you not say something to the Court [like] I cannot see this. |
| [Petitioner]: | Your Honor, they should have knew [sic] that because when I filled out the papers for the lawyer the first time, I told them I couldn't read it and I couldn't see it. |
| [Trial court]: | And so, you told the lawyers you could not see it? |
| [Petitioner]: | Yes. |
| [Trial court]: | And when I asked you questions personally out here in open court, you did not say you could not see it, did you? |
| [Petitioner]: | Your Honor, you scare me and I respect you and if you said it, I just probably let it go and that's that. I'm sorry. |
| [Trial court]: | But you did not tell me you could not see what you had signed, did you? |
| [Petitioner]: | Your Honor, I can't, I can't see nothing. I have to get it up close to see it . . . . But when I got to Brushy, they give me some glasses and I can read some things, not real good. |

At trial, on cross-examination, the prosecutor showed Petitioner the appearance bond, which states that he is prohibited from contact with the victim, asking Petitioner if he had read what he had signed. Petitioner responded, "I can't really see that good." Also during the trial, the prosecutor showed Petitioner another exhibit and asked Petitioner, "Do you wear glasses?" Petitioner responded, "I need some." Petitioner also testified at the post-conviction hearing that he did not understand that, by the terms of the negotiated plea agreement, he waived his right to appeal the jury's guilty verdict on count five.

**Ineffective Assistance of Counsel**

Petitioner contends that trial counsel made the following errors: (1) he failed to raise the issue of a fatal variance between the indictment and the proof; (2) he failed to interview and present testimony of certain witnesses; (3) he requested the trial court's permission to reserve his opening statement until after the State's case-in-chief, which the trial court denied, in the presence of the jury. Petitioner also claims that Assistant Public Defender Nancy Meyer, who was initially appointed to represent Petitioner, but later withdrew, was ineffective for misplacing certain exculpatory evidence.

This Court reviews a claim of ineffective assistance of counsel under the standards of *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975), and *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the defendant so as to deprive him of a fair trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the reviewing court need not address the components in any particular order or even address both if one is insufficient. *Goad*, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

The test to determine whether counsel provided ineffective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *State v. Honeycutt*, 54 S.W.3d 762, 767 (Tenn. 2001). Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065).

When a petitioner claims ineffective assistance of counsel in relation to a guilty plea, the petitioner must prove that counsel performed deficiently, and, but for counsel's errors, petitioner would not have pled guilty but would have, instead, insisted upon going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985).

**Failure to Act on Variance**

First, Petitioner asserts that trial counsel was ineffective for failing to raise as an issue at trial that a variance existed between the indictment, which alleged that the incident occurred "on or about November, 1998," and the proof at trial. At trial, the victim testified that she did not remember the date on which the incident occurred. She testified, however, that the incident occurred when she was "going into the fourth grade," in 1998, two years prior to the trial. She testified that on the day of the incident, she was wearing shorts and a short-sleeve shirt. The incident occurred after the victim and Petitioner, whom she called "Pawpaw," had finished mowing lawns. Petitioner was driving a white car with blue seats which belonged to Sandra York, the victim's grandmother. The victim testified that Petitioner pulled over to the side of the road and raped her inside the vehicle. On the day following the incident, Petitioner gave the victim a small green toy that was a glow-in-the-dark alien. April Yarber, the victim's mother, testified that she first saw the "little green alien" toy "either at the end of the summer or the beginning of fall, [1998]." Mary Ann Phillips, the victim's step-sister, testified that the toy was a "Halloween toy."

At the post-conviction hearing, Mr. Angel testified that he did not point out the variance between the indictment and the proof because he instead made the competent decision to focus on inconsistencies in the victim's testimony at trial.

The State argues that any variance between the proof and the date alleged in the indictment is not material. In *State v. Moss*, 662 S.W.2d 590 (Tenn. 1984), our supreme court stated as follows:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

*Id.* at 592; *see also State v. Gieck*, 29 S.W.3d 57, 60 (Tenn. 1999).

A variance between the indictment and the proof at trial will not be held fatal unless it is both material and prejudicial. *State v. Holloman*, 835 S.W.2d 42, 45 (Tenn. Crim. App. 1992). Furthermore, "[a] material variance will not be found where the allegations and proof substantially correspond." *Id.* Tennessee Code Annotated section 40-13-207 provides, "[t]he time at which the offense was committed need not be stated in the indictment, . . . unless the time is a material ingredient in the offense." In *State v. Byrd*, 820 S.W.2d 739 (Tenn. 1991), our supreme court held, "[t]he rule of law is well-established in Tennessee that the exact date, or even the year, of an offense need not be stated in the indictment or presentment unless the date or time 'is a material ingredient in the offense.'" *Id.* at 740 (quoting Tenn. Code Ann. § 40-13-207).

Petitioner argues that the variance affected substantial rights of his because the indictment alleged other incidents of sexual abuse against the same victim on other dates. Petitioner asserts that the jury reached a "patchwork verdict," as proscribed in *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999). In *Brown*, our supreme court held that "[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Id.* at 391. The State argues that this argument is without merit because Petitioner was charged with only one count of rape of a child, and proof of only one act of rape of a child was presented at trial. We agree.

Count five is the only one of twenty-eight counts in the indictment that charges Petitioner with rape of a child against the victim in the underlying jury trial. In counts four and six, Petitioner was charged with aggravated sexual battery against the same victim in the summer of 1998 and winter of 1998-1999. The other offenses charged in the indictment include several counts of aggravated sexual battery, statutory rape, and rape of a child against other victims. The other offenses charged in the indictment were all alleged to have occurred in 1998 and 1999. Based on

the proof at trial and the offenses alleged in the indictment, we conclude that Petitioner was sufficiently aware of the charges against him and was able to adequately prepare for trial. *See State v. Moss*, 662 S.W.2d at 592. We conclude that Petitioner's trial counsel was not ineffective for not raising a variance as an issue at trial. Petitioner is not entitled to relief on this issue.

**Failure to Interview Witnesses**

Next, Petitioner asserts that trial counsel was ineffective for failing to interview and present the testimony of Hubert Wallace, Art Moore, and Dewayne Wilson. In its written order denying post-conviction relief, the trial court found that Hubert Wallace "had no relevant testimony regarding the charges investigated at the original trial." The trial court also found that Dewayne Wilson was "not sufficiently credible to set aside a voluntary plea in this case." The post-conviction court made no specific finding regarding the testimony of Art Moore.

"When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness or call the witness to the stand resulted in the denial of critical evidence which caused the petitioner prejudice. *Id*. Neither the trial court nor this Court can speculate on what a witness' testimony might have been if introduced by counsel. *Id.*

At the post-conviction hearing, Hubert Wallace testified that while he was incarcerated, Art Moore told him that Mr. Wallace's daughter had been molested. During Petitioner's trial, Mr. Wallace approached Petitioner in the hallway outside of the courtroom. Mr. Wallace testified that Petitioner told him, "I'm not the one who molested your daughters. You need to be looking into where they are being raised up at." Petitioner's trial counsel, Kevin Angel, testified at the post-conviction hearing that he attempted to contact Mr. Wallace, but he was unable to locate him. Mr. Angel went to the address provided by both Mr. Wallace's probation officer and the court clerk, but Mr. Wallace no longer lived there.

The State argues that Mr. Angel made a sufficient attempt to locate Mr. Wallace. The State further argues that Petitioner has failed to establish that he was prejudiced by trial counsel's failure to locate and present the testimony of Mr. Wallace. We agree. Petitioner has not established that the evidence preponderates against the trial court's conclusion that Mr. Wallace's testimony was not relevant. Petitioner was not prejudiced by Mr. Angel's failure to present the testimony of Hubert Wallace.

Petitioner asserts that he was prejudiced by Mr. Angel's failure to locate and present the testimony of Art Moore. At the post-conviction hearing, Mr. Moore testified that his mother, Sandy York, had a 1987 Oldsmobile Cutlass that "hasn't ran about four years." He testified that he "got

rid" of the vehicle before Petitioner's trial and that it had not run for about "three or four years" prior to that. Mr. Angel testified at the hearing that he would have called Mr. Moore to testify at trial to corroborate the testimony of Petitioner and Ms. York that the vehicle was inoperable, but "Art Moore's name was never mentioned to [him]." Mr. Angel also testified that Petitioner and Ms. York did not inform him that the car was inoperable until the second day of Petitioner's two-day trial. The post-conviction court implicitly found Mr. Angel's testimony to be credible, and we conclude that Mr. Angel was not ineffective for failing to interview and present the testimony of a witness about whom he was not informed by Petitioner. Furthermore, Petitioner has not established prejudice. Evidence that the vehicle was not running was actually presented at trial.

Petitioner argues that Petitioner's son, Dwayne Wilson, also could have corroborated the testimony that the vehicle was not running at the time of the offense. Petitioner also asserts that Dwayne Wilson could have provided evidence that someone other than Petitioner committed the offense. Dwayne Wilson was eleven years old at the time of Petitioner's trial. He testified at the post-conviction hearing that he lived with Petitioner and Sandy York. He testified that the white Oldsmobile parked at Ms. York's residence was inoperable and described the vehicle's condition. However, he could not remember how long the car had not been running. He also testified that Jason Moore took the victim on walks in the woods and showed Dwayne and the victim "nasty" movies. The State argues that this testimony would have been inadmissible at trial because identity was not an issue at trial. The victim identified Petitioner at trial as the person who raped her. We conclude that Petitioner has failed to show that Dwayne Wilson's testimony would have affected the outcome of Petitioner's trial, and therefore, Petitioner was not prejudiced by trial counsel's failure to call Dwayne Wilson as a witness.

## Request to Reserve Opening Statement

Petitioner argues that trial counsel was ineffective for unsuccessfully requesting the trial court's permission, in the presence of the jury, to reserve his opening statement until after the State's case-in-chief. Trial counsel stated, "Your Honor, defense would respectfully request this Court to allow us to open before we put on our proof at the end of state's proof." During a bench conference, the court denied counsel's request.

Tennessee law requires that opening statements be made prior to the presentation of any evidence. *State v. Van Tran*, 864 S.W.2d 465, 474-475 (Tenn. 1993). Opening statements are not evidence, but rather statements setting forth the parties' "respective contentions, views of the facts and theories of the lawsuit." Tenn. Code Ann. § 20-9-301. Mr. Angel testified at the post-conviction hearing that he had not represented a defendant in a jury trial prior to Petitioner's case. However, his request did not suggest that he was unprepared. Upon the trial court's denial of his request, Mr. Angel gave an opening statement to the jury, which set forth what he expected the evidence to show, and the evidence at trial largely conformed to it. We conclude that Petitioner has failed to show that he was prejudiced by trial counsel's request to reserve his opening statement until after the close of the State's proof.

**Waiver of Direct Appeal**

Petitioner argues that the waiver of his appeal as of right from his conviction in the jury trial as part of the negotiated plea agreement entered into subsequent to the jury verdict is invalid. Tennessee Rule of Criminal Procedure 37 provides:

> (d) Pursuing or Waiving an Appeal. – Before the judgment upon the verdict of guilty becomes final, the defendant, in person or by counsel must file a notice of appeal in accordance with Rule 4(a), Tennessee Rules of Appellate Procedure. Counsel for all defendants, whether indigent or not, who have a right to appeal from a judgment of conviction, shall either timely file such notice of appeal or file with the clerk during the time within which the notice of appeal could have been filed, a written waiver of appeal signed by the defendant. Such waiver of the right of appeal shall clearly reflect that the defendant was aware of the right and voluntarily waived it. Such waiver shall be subscribed to by counsel of record for the defendant.

Tenn. R. Crim. P. 37(d).

Petitioner asserts that neither of two purported written waivers of appeal comply with the requirements of this rule. A "Waiver of Trial by Jury and Request for Acceptance of Plea of Guilty as Best Interest" was filed with the trial court on January 19, 2001. Regarding Petitioner's waiver of appeal from his conviction in the jury trial, the waiver and plea agreement simply states, "Waiver of direct appeal of conviction on Count 5." Petitioner signed the waiver, but the signature line for defense counsel is blank. At the post-conviction hearing, Mr. Angel testified that Mr. Pratt, appointed co-counsel, had reviewed the plea agreement with Petitioner, but the failure of either defense counsel to sign it was probably due to the confusion resulting from the dual representation of Petitioner.

A "Waiver of Sentencing Pursuant to [Tennessee Rule of Criminal Procedure] 11(e)(1)(C)" was also filed in the trial court, which sets forth the agreed upon sentences for each count to which Petitioner entered his guilty pleas. That document was signed by Petitioner and Assistant District Attorney Jan Hicks, but the signature line for defense counsel is also blank. The document states as follows:

> With respect to **Count 5**, on which a jury found defendant guilty of Rape of A [sic] Child on October 18, 2000, defendant will receive a sentence of 22 years in the Department of Correction and **in return for this agreement by the State, defendant is waiving his right to appeal the verdict and sentence.**

[Emphasis in original].

In *Carter v. State*, 102 S.W.3d 113 (Tenn. Crim. App. 2002), this Court held that a defendant's waiver of his right to appeal "should be reduced to writing in a document signed by the defendant, subscribed to by counsel, and clearly reflecting the defendant's awareness of the right to appeal and voluntarily waiving it." *Id.* at 119 (citing Tenn. R. Crim. P. 37(d)). "Failure to conform to [Rule 37(d)] does not, however, violate a constitutional right." *Rainer v. State*, 958 S.W.2d 356, 357 (Tenn. Crim. App. 1997).

Following the post-conviction hearing, in a written order, the trial court concluded that Defendant made a knowing and voluntary waiver of his right to appeal. At the guilty plea hearing, Petitioner testified that he was satisfied with Mr. Angel's representation, and Petitioner indicated that he understood the plea agreement. However, the trial court did not directly question Petitioner regarding his waiver of the right to appeal. The prosecutor advised the court of the waiver:

> [Prosecutor]: The one thing that the Court didn't mention is that he is agreeing to a 22-year sentence on Count 5 that the jury convicted him of. And in return for this, we're allowing him to do this. He is also waiving his right to appeal the verdict and the sentence in that particular case so this would be a final judgment.
>
> . . . .
>
> [Trial court]: But I have here that there is a waiver of the direct appeal on Count No. 5, and she tells me and it's not in here but there is a 22-year sentence that will be concurrent.
>
> [Mr. Angel]: Yes, Your Honor.

Although neither attorney for Defendant signed the waivers, Mr. Angel testified at the post-conviction hearing that Mr. Pratt "thoroughly" explained the plea agreement to Petitioner. At the guilty plea hearing, Mr. Pratt told the court that he had read the agreement to Petitioner. We conclude that the evidence does not preponderate against the trial court's findings. The trial court properly concluded that Petitioner waived his right to appeal the jury verdict.

**Knowing and Voluntary Guilty Plea**

Petitioner argues that his guilty pleas were not knowingly and voluntarily entered. Petitioner asserts that he was not advised of his rights by trial counsel prior to entering the plea agreement, that he was unable to read the plea agreement because he did not have glasses, and that his level of intelligence prevented him from understanding the consequences of his guilty pleas.

In *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), the Tennessee Supreme Court set forth the procedure for trial courts to follow in accepting guilty pleas. *Id.* at 341. Prior to accepting a guilty plea, the trial court must address the defendant personally in open court, inform the defendant

of the consequences of a guilty plea, and determine whether the defendant understands those consequences. *Id.*; Tenn. R. Crim. P. 11. However, a trial court's failure to follow the procedure mandated by *Mackey* does not necessarily entitle the defendant to seek post-conviction relief. *See State v. Prince*, 781 S.W.2d 846, 853 (Tenn. 1989).

At the guilty plea hearing, the trial court advised Petitioner that he was entitled to the presumption of innocence; that he had the right to a speedy trial by a jury; that he had the right to counsel; that he had the right to confront witnesses against him; that he had the right to compulsory process to bring witnesses to testify in his behalf; that he had the right to testify; and that he had the right against self-incrimination. Petitioner indicated that he understood those rights. The trial court asked Petitioner whether he was entering his pleas freely, and Petitioner responded, "Yes, sir." Mr. Pratt informed the court that he had read the plea agreement to Petitioner. We conclude that the trial court substantially complied with the requirements of *Mackey*. We also conclude that the evidence does not preponderate against the trial court's finding that Petitioner's pleas were voluntary and knowing.

Petitioner also asserts that the trial court should not have accepted his pleas because a factual basis was not provided for two of the counts to which he entered his "best interest" guilty pleas. In *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), the United States Supreme Court held that a defendant may plead guilty even if he claims innocence if "the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Id.* "A trial judge may accept a guilty plea even when the defendant says that he is innocent so long as there is a factual basis for the plea." *Hicks v. State*, 983 S.W.2d 240, 247 (Tenn. Crim. App. 1998).

At the guilty plea hearing, the State listed the counts of the indictment to which Petitioner was pleading guilty and gave the circumstances of each offense. Petitioner claims that for counts 13 and 25, which charged Petitioner with aggravated sexual battery and rape of a child, the prosecutor did not state that the victim was under the age of thirteen, which is an essential element of both offenses. *See* Tenn. Code Ann. § 39-13-504, -522. However, the indictment sufficiently informed Petitioner of the charges against him. Count 13 specifically informed Petitioner that he was charged with aggravated sexual battery of a victim less than thirteen years of age. At the guilty plea hearing, the State provided the trial court with the following factual basis:

> In Count 13, this is a sister and this occurred in a church parking lot here in Anderson County that was close to a store, a kind of mini-mart store. And on that occasion, the defendant touched the breasts of the child and said: How long could he do that if he let her smoke.

Additionally, count 25 of the indictment informed Petitioner that he was charged with rape of a child less than thirteen years of age. The State provided the trial court with the following factual basis:

On Count 25, this is another incident that occurred before Christmas in that year in the grandmother's house in Anderson County, the grandmother was gone to the store. The defendant placed his penis in the child's mouth, and she would say that stuff came out. This was the incident that also David Hawkins, the co-defendant, was there and the child would say that the defendant told David Hawkins to do the same thing with the child and David Hawkins did that after the defendant told him to do it.

We conclude that the trial court's acceptance of Petitioner's guilty pleas was proper, and the evidence does not preponderate against the trial court's finding that Petitioner's guilty pleas were voluntary and knowing.

**Failure to Give Evidence to Subsequently Appointed Counsel**

Petitioner asserts that Nancy Meyer, who withdrew from her representation of Petitioner prior to trial, was ineffective for failing to give to subsequently appointed counsel certain cards and letters expressing affection of the victim toward Petitioner. Ms. Meyer testified at the post-conviction hearing that her office manager discovered those cards and notes two weeks prior to the hearing, and they were introduced as exhibits at the hearing. The trial court found that the cards and notes were "circumstantial evidence at best" and if presented at trial "would have been cumulative" because similar evidence was admitted at trial. We agree.

Tennessee Rule of Evidence 403 provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The items found by Ms. Meyer's office assistant and admitted as exhibits at the post-conviction hearing include a letter which states, "You are the best Papaw," and "I love you Papaw you are very good to me;" a letter that states "From [the victim] to PaPa [sic]," and repeatedly states, "I love you Papa;" a Valentine's Day card which is signed by the victim and several others; a letter that states, "Pappaw Roger I love you;" and two additional letters signed by someone other than the victim in the underlying jury trial. None of the cards or letters are dated.

Only two of the items discovered after Petitioner's trial concluded were signed by the victim in the underlying jury trial. Neither of those letters have dates on them. A letter written by the victim to Petitioner and Ms. York was admitted into evidence at trial. The victim initially testified at trial that she wrote the letter after the incident occurred, and she later changed her testimony and stated that she wrote the letter before the incident occurred.

We conclude that Petitioner has failed to show that he was prejudiced by Ms. Meyer's failure to turnover the misplaced items to subsequent counsel. We also conclude that the trial court properly concluded that those items would have been cumulative at trial.

**CONCLUSION**

We find no reversible error and affirm the judgment of the trial court.

_____

THOMAS T. WOODALL, JUDGE