# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 10, 2022 Session

## STATE OF TENNESSEE v. SARIOGLO SERGHEI[1]

**Appeal from the Criminal Court for Sumner County**
**No. 2020-CR-389   Dee David Gay, Judge**

_____

### No. M2021-00776-CCA-R3-CD

_____

Sarioglo Serghei, Defendant, was issued a citation alleging that he "failed to move over for officer traffic stop (lights on)."  Following a bench trial, the trial court found Defendant guilty of violating Tennessee Code Annotated Section 55-8-132(b), a Class B misdemeanor, and imposed a sentence of thirty days suspended to unsupervised probation and a fine of one hundred dollars.  Following a thorough review of the record and applicable law, we determine that Defendant had limited English proficiency, that the trial court failed to comply with Tennessee Supreme Court Rule 42,  and that proceeding with the trial when Defendant did not have the necessary means to communicate violated his constitutional right to testify and to be heard.  We reverse the judgment of conviction and remand for a new trial consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Case Remanded for New Trial**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Stanley F. LaDuke, Knoxville, Tennessee, for the appellant, Sarioglo Serghei.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Gregory Dale Sweeney, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Defendant testified that his first name is Serghei and that his last name was Sarioglo.  However, he was indicted as "Sarioglo Serghei," and the judgment was entered in the name Sarioglo Serghei.  We will use the name in the indictment in this opinion.

1

## OPINION

On June 1, 2021, Defendant filed a motion pursuant to Tennessee Rules of Criminal Procedure 28 and Tennessee Supreme Court Rule 42 seeking to have the trial court "approve and/or appoint a Russian interpreter" for his trial scheduled to begin June 11, 2021. In the motion, Defendant claimed that his "primary language is Turkish and [that] he speaks and understands the Russian language" and that, when Defendant "was present in [c]ourt on November 12, 2020, [he had] difficulty understanding and answering the [c]ourt's questions to him because he has a limited ability to speak and understand the English language."

## Trial

At the outset of the bench trial, the trial court noted that Defendant did not secure the services of a court reporter. The court moved the trial to a courtroom equipped to record testimony of preliminary hearings under Rule 5.1(a)(3) of the Tennessee Rules of Criminal Procedure. The trial was contemporaneously recorded on two CD-R discs, and pursuant to Tennessee Rule of Appellate Procedure 24(b), a transcript of the trial was prepared by a certified court reporter from the CD-R discs. Both the transcript and the two CD-R discs are included in the appellate record.

The trial court also noted that Defendant "ha[d] mentioned a problem with language in that [D]efendant requested a Russian interpreter," that the Administrative Office of the Courts (AOC) "had difficulty in finding one, and [D]efendant ha[d] not been able to procure a Russian translator."

### *State's Proof*

Westmoreland Police Sergeant Kenneth Witte testified that he was traveling downhill in the southbound lane of U.S. Highway 31E ("US 31E") to back up another Westmoreland police officer who was performing a traffic stop. The other Westmoreland police officer, who did not testify and was not identified by name in the record, was parked at the bottom of the hill in the shoulder of the northbound lane of US 31E near the intersection of Lake Road with the emergency lights of his marked police cruiser activated. Sergeant Witte testified that, as he "was approaching southbound, [he] observed an 18-wheeler going northbound" that "passed by my officer without crossing over." Sergeant Witte said that he "got [Defendant] on radar doing 47 in a 45" and that "[t]here was nobody else in front of [Sergeant Witte's] vehicle towards [Defendant's] vehicle." Sergeant Witte said that the 18-wheeler "never broke over the double yellow line" as it passed by the

2

location of the traffic stop.[2]  When the State asked Sergeant Witte if Defendant slowed down, Sergeant Witte answered, "No, ma'am.  It was at a same speed of 47 miles an hour." He said that, at the location of the traffic stop, US 31E was a straight, two-lane highway, that the weather was "59 degrees and sunny," and that there was nothing "that would have hindered [Defendant's] eyesight of the officer's blue lights."

On cross-examination, Sergeant Witte said that he was "just north of Bentel Drive," "roughly about a quarter mile" from the location of the traffic stop, when he saw the 18-wheeler.  The following dialogue is from the cross-examination of Sergeant Witte:

> [DEFENSE COUNSEL:] Okay, and you're saying that -- is it your opinion that [Defendant] in the tractor trailer should have crossed over the centerline when he passed the officer on the traffic stop?
>
> [SERGEANT WITTE:] Either that or slow down safe enough for the officer if he walked down the street not to get hit, yeah.
>
> [DEFENSE COUNSEL:] So –
>
> [SERGEANT WITTE:] He had plenty of room to pull over and nobody was in his way.
>
> [DEFENSE COUNSEL:] So you're saying in your opinion [Defendant] should have crossed the centerline when he passed the officer and the vehicle?
>
> [SERGEANT WITTE:] Yes, sir.
>
> [DEFENSE COUNSEL:] Is that [] considered a safe maneuver in an 18-wheeler?
>
> [SERGEANT WITTE:] Yes, sir.
>
> [DEFENSE COUNSEL:] You realize that you're coming down towards him a quarter of a mile away and you want him to come over into your lane of traffic head on?

---

[2] A video taken by defense counsel from a vehicle traveling north on US 31E, entered as Exhibit 4, shows a broken yellow centerline at the intersection of Lake Road.  The double yellow line ended a short distance south of the intersection.

[SERGEANT WITTE:] Would not have had a problem with that. They do it all the time. Because I would also slow down and move to the right and go on the shoulder and give them the leeway to come that way.

[DEFENSE COUNSEL:] What about any vehicles behind you that see you slow down and pull over?

[SERGEANT WITTE:] They would - - sir, I see it all day long and they pull over to the shoulder and let the people go on - - cross over the line. I see it all the time.

[DEFENSE COUNSEL:] It's possible [] they could try to go around you or run into you, isn't it?

. . . .

[SERGEANT WITTE:] There's a possibility I could run off the side of the road too, yes. Okay.

The following exchange concerned whether there were other vehicles in front of Defendant:

[DEFENSE COUNSEL:] What other vehicles did you see in the roadway going northbound?

[SERGEANT WITTE:] There were no other vehicles northbound. Not in front of [D]efendant's vehicle, no.

[DEFENSE COUNSEL:] You remember -- do you have a specific memory of what cars were approaching -- oncoming towards you?

[SERGEANT WITTE:] Approaching the officer on the side of the road or approaching me?

[DEFENSE COUNSEL:] Well, going northbound on 31.

[SERGEANT WITTE:] My concern was with the 18-wheeler which I was approaching.

[DEFENSE COUNSEL:] What specific memory do you have of any other vehicle that was present?

[SERGEANT WITTE:] I don't now. I don't.

4

[DEFENSE COUNSEL:] You don't remember any other vehicle?

[SERGEANT WITTE:] No, sir.

Sergeant Witte agreed that his radar would pick up the closer of two approaching vehicles. Sergeant Witte stated that he did not "lock" Defendant's speed on his radar, explaining that "there was no reason to lock in if they're going two miles over the limit." Sergeant Witte said that he made a "U-turn" at Bentel Drive, pursued the 18-wheeler north, and stopped it near the crest of the hill. Sergeant Witte said that there was also an unmarked Westmoreland police vehicle stopped at the stop sign where Bentel Drive intersects US 31E and that this officer, who did not testify and was not named in the record, turned north and followed him to where he stopped Defendant.

*Defendant's Proof*

Part, and occasionally all, of Defendant's responses to questions asked by defense counsel, the State, or the trial court, are characterized by the court reporter as "(indiscernible)" at forty-nine places in the approximately sixteen pages of transcript containing Defendant's testimony. Although we cannot ascertain from the transcript alone why Defendant's testimony was indiscernible, it is apparent from the CD-R recording that it relates directly to Defendant's limited ability to speak or understand the English language. Although much of Defendant's testimony is indiscernible, we will summarize the Defendant's testimony as best as we can based on the transcript and audio recording.

Defendant testified that his last name was Sarioglo and that he had worked in the United States since 2013 driving "18-wheeler, car hauler." Although he was born in Russia, he said that he was Turkish. He said that his primary language was Turkish and that his secondary language was Russian.

Defendant testified that he was driving a 2016 Volvo tractor pulling a fully-loaded car hauler trailer with a combined weight of 80,000 pounds when he was stopped. Defendant said that, after stopping at a four way stop at the intersection with Austin Peay Highway, he crested a hill and proceeded downhill in a northerly direction on US 31E. Defendant said that there was a small pickup truck traveling north in front of him. He said that he saw the police vehicle in the right-hand shoulder with its emergency lights activated. He said that there was no one outside of the police car or the other vehicle. He testified that he slowed down and moved his "18-wheeler" to the left so that his driver's side tires were on or near the centerline of the highway. He said that the reason he did not cross into the other lane was because there was a vehicle coming downhill towards him and that he could not make quick turns because he had a full load of cars on the trailer and could "flip" over.

5

On cross-examination, when asked by the State why he did not "scoot over," Defendant answered, "I did, middle line as soon as possible. (indiscernible) pulled my truck middle line. I did what I can. Because other vehicle coming on (indiscernible). I was (indiscernible). I can't do like quick turn." When asked why he did not slow down, Defendant said, "I slowed down. (Indiscernible) on my truck, it's not electronic. (Indiscernible) or I can't exactly see how many miles like an electronic (indiscernible), you know."

After defense counsel completed his redirect examination, the trial court questioned Defendant extensively. The trial court asked Defendant, "Can you slow your tractor trailer down some?" Defendant answered, "I (indiscernible) when I -- when I -- before police officer was still on the shoulder, before that vehicle -- a lot of vehicles oncoming (indiscernible)." The court asked Defendant if he "significantly slow[ed] down[,]" and Defendant answered, "I slowed down." The court stated, "That's not my question. Did you significantly slow down?" Defendant answered, "I don't understand (indiscernible)." The court then asked Defendant if he "ma[d]e every effort to go as slow as [he] could[,]" and Defendant answered, "[Y]es." The trial court then stated, "You heard the officer testify that you didn't and you were on radar. So let me remind you you're under oath. My question was did you slow down?" Defendant answered, "I did slow down."

*Findings of Fact and Conclusions of Law of the Trial Court*

After the trial court accredited the testimony of Sergeant Witte, the court made the following findings:

1. Defendant "did not proceed with due caution, the caution due to an officer on the side of the road in a rural area with lights flashing, and that he did not reduce the speed of the vehicle."

2. Sergeant Witte's testimony is corroborated by radar showing that Defendant was going over the speed limit and never slowed down.

3. There were no weather conditions or road conditions that would hinder a vehicle slowing down in this situation.

4. Defendant did not maintain a safe speed for road conditions under that particular situation.

5. Changing lanes at the location of the traffic stop was not impossible or unsafe.

6. Defendant's testimony that there were other vehicles on the road is discredited in light of the testimony of the Sergeant Witte who said there were no vehicles on the road.

7. Defendant's testimony that he touched the centerline is discredited.

8. The State has proven all the elements of the traffic violation of Tennessee Code Annotated section 55-8-132.

The trial court found Defendant guilty of violating Tennessee Code Annotated section 55-8-132 and imposed a sentence of thirty days in jail suspended to unsupervised probation and a fine of one hundred dollars. Defendant timely appealed.

**Analysis**

On appeal, Defendant claims that the trial court: erred or abused its discretion in its participation in the trial; erred by failing to consider Defendant's limited ability to understand English; abused its discretion by sustaining four objections to witness testimony regarding the issue of safety; erred in accepting and relying on radar evidence alone with no corroborating evidence; and abused its discretion in its assessment of the credibility of witnesses. Defendant also claims that the evidence was insufficient to sustain a guilty verdict beyond a reasonable doubt. The State responds that: Defendant failed to establish plain error concerning the trial court's examination of Defendant; the trial court properly exercised its discretion by not appointing an interpreter; the trial court properly sustained the objections to witness testimony, and that the radar evidence was corroborated by Sergeant Witte's testimony that Defendant failed to reduce his speed. The State also claims and that the evidence is sufficient to sustain Defendant's conviction.

*Limited Ability to Speak or Understand the English Language*

Defendant argues that, although the trial court "had notice that [Defendant] had difficulty understanding English, both from his motion requesting a Russian Interpreter and his appearance before the [t]rial [c]ourt on November 12, 2020," the court "made no attempt to determine if Defendant had limited ability to speak and understand English."

> Many persons who come before the courts are partially or completely excluded from full participation in the proceedings due to limited English proficiency ("LEP"). It is essential that the resulting communication barrier be removed, as far as possible, so that these persons are placed in the same position as similarly situated persons for whom there is no such barrier.

Tenn. Sup. Ct. R. 41 (Preamble), *see* Tenn. Sup. Ct. R. 42 §2(4) (an LEP person is defined as "a participant in a legal proceeding who has limited ability to speak or understand the English language"). The communication barrier directly impacts an LEP person's right to testify and to be heard. The right to testify is "a fundamental constitutional right guaranteed both by Article I, section 9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution." *Momon v. State*, 18 S.W.3d 152 (Tenn.

1999). The Tennessee Constitution provides that "the accused hath the right to be heard by himself and his counsel[.]" Tenn. Const. art. I, § 9.

A court[3] has a duty "to determine whether a participant in a legal proceeding has a limited ability to understand and communicate in English." Tenn. Sup. Ct. R. 42, § 3 (a); *see also State v. Thien Duc Le*, 743 S.W.2d 199, 202 (Tenn. Crim. App. 1987) (stating that it is the duty of the court to provide the necessary means for the defendant to communicate to the court). "If the court determines that a participant has such limited ability, the court should appoint an interpreter pursuant to this rule." Tenn. Sup. Ct. R. 42, §3(a). "A summary of the efforts made to obtain a certified or registered interpreter . . . should be made in open court." Tenn. Sup. Ct. R. 42, §3(f). Although the appointment of an interpreter is a matter of judicial discretion," the failure to appoint an interpreter may undermine the fairness of the proceeding, *Sud v. Man Keng Ho*, No. E2011-01555-COA-R3-CV, 2012 WL 1079896, at *8 (Tenn. Ct. App. Mar. 30, 2012), and violate the defendant's "constitutional right to be heard." *Thien Duc Le*, 743 S.W.2d at 202.

"The recognition of the need for an interpreter may arise from a request by a party or counsel, the court's own voir dire of a party or witness, or disclosures made to the court by parties, counsel, court employees or other persons familiar with the ability of the person to understand and communicate in English." Tenn. Sup. Ct. R. 42, § 3 (b). "The interpreter has a twofold duty: 1) to ensure that the proceedings in English reflect precisely what was said by the LEP person, and 2) to place the LEP person on an equal footing with those who understand and speak English." Tenn. Sup. Ct. R. 41, Canon 1 (A).

The record on appeal does not include any written or oral order addressing Defendant's June 1, 2021 motion seeking to have the trial court "approve and/or appoint a Russian interpreter." The record does not show that the trial court addressed whether or not Defendant was an "LEP person." Tenn. Sup. Ct. R. 41, 42, § 2 (4). The record does not show that Defendant, if he was an LEP person, waived the services of an interpreter pursuant to Tennessee Supreme Court Rule 42, § 4 (b). The trial court did not provide a summary of its "efforts made to obtain a certified or registered interpreter," other than mentioning that the AOC had difficulty finding a Russian interpreter. *See Man Keng Ho*, 2012 WL 1079896, at *8 (stating that "[t]here is nothing in the record to establish that any effort was made to find a credentialed interpreter and the use of Ho as interpreter who was a party to the proceeding, undermined the fairness of the proceeding").

In *State v. Young Bok Song*, No. M2004-02885-CCA-R3-CD, 2005 WL 2978972, at *6 (Tenn. Crim. App. Nov. 4, 2005), this court noted that, "when reviewing the trial court's decision not to appoint an interpreter, we must look at the information the trial court had to rely on in making its decision." *Id.* As mentioned previously, the word "indiscernible" is used at forty-nine places in the transcript prepared by the certified court

---

[3] Rule 42 applies to all courts in Tennessee. Tenn. Sup. Ct. R. 42, §1.

reporter from the audio recording of the trial to characterize testimony of Defendant that could not be understood. Moreover, it is apparent from listening to the contemporaneously recorded CD-R that Defendant's limited ability to speak or understand the English language led to his testimony being characterized as indiscernible.

The trial court was responsible for determining whether Defendant had a limited ability to understand and communicate in English. Tenn. Sup. Ct. R. 42, § 3 (a). Based on the pretrial motion filed by Defendant, the court knew that Defendant claimed to have limited English proficiency. Defendant struggled to speak in discernible English as the trial progressed, especially when confronted with what Defendant describes as the trial court's "excessive cross-examination [which] reached the zenith of intensity and forcefulness, even hostility, as if the [t]rial [c]ourt was trying to make [] Defendant 'break' or 'confess,' after the State failed to accomplish this result." Proceeding with the trial when Defendant did not have the necessary means to communicate violated his constitutional right to testify and to be heard, *Thien Duc Le*, 743 S.W.2d at 202; was unreasonably prejudicial to Defendant's case, *Van Tran v. State*, 864 S.W.2d 465, 476; undermined the fairness of the proceeding, *Sud*, 2012 WL 1079896, at *8; and caused an injustice to Defendant. *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

## Conclusion

We reverse the conviction and remand for a new trial in accordance with Tennessee Rule of Criminal Procedure 28 and Tennessee Supreme Court Rule 42. Because our ruling on this issue is dispositive of this cause, we need not address the remaining issues presented by the parties. *State v. Turco*, 108 S.W.3d 244, 245 (Tenn. 2003).

_____
ROBERT L. HOLLOWAY, JR., JUDGE

9